The United States, Plaintiff in error, *vs.* John P. Gratiot, Robert Burton, Charles S. Hempstead, and Dickerson B. Moorehouse, Defendants in error.

The United States instituted an action on a bond given by the defendants, conditioned that certain of the obligors who had taken from the agent of the United States, under the authority of the President of the United States, a license for smelting lead ore, bearing date September 1st, 1834, should fully execute and comply with the terms and conditions of a license for purchasing and smelting lead ore, at the United States' lead mines, on the Upper Mississippi river, in the state of Illinois, for the period of one year. The defendants demurred to the declaration, and the question was presented to the Circuit Court of Illinois, whether the President of the United States had power, under the act of Congress of 3d of March, 1807, to make a contract for purchasing and smelting lead ore, at the lead mines of the United States, on the Upper Mississippi. This question was certified from the Circuit, to the Supreme Court of the United States. Held, that the President of the United States has power, under the act of Congress of 3d of March, 1807, to make the contract on which this suit was instituted.

The power over the public lands is vested in Congress by the Constitution, without limitation, and has been considered the foundation on which the territorial governments rest.

The cases of M·Culloch *vs.* The State of Maryland, 4 Wheat. 422; and The American Insurance Company *vs.* Canter, 1 Peters, 542, cited.

The words "dispose of" the public lands, used in the Constitution of the United States, cannot, under the decisions of the Supreme Court, receive any other construction than that Congress has the power, in its discretion, to authorize the leasing of the lead mines on the public lands, in the territories of the United States. There can be no apprehensions of any encroachments upon state rights by the creation of a numerous tenantry within the borders of the states, from the adoption of such measures.

The authority given to the President of the United States to lease the lead mines, is limited to a term not exceeding five years. This limitation, however, is not to be construed as a prohibition to renew the leases from time to time, if he thinks proper so to do. The authority is limited to a short period, so as not to interfere with the power of Congress to make other dispositions of the mines, should they think the same necessary.

The legal understanding of a lease for years, is a contract for the possession and profits of land for a determinate period, with the recompense of rent. It is not necessary that the rent should be in money. If reserved in kind, it is rent in contemplation of law.

The law of 1807, authorizing the leasing of the lead mines, was passed before Illinois was organized as a state. She cannot now complain of any disposition or regulation of the lead mines, previously made by Congress. She surely cannot claim a right to the public lands, within her limits.

ON a certificate of division from the Circuit Court of the United States, for the District of Illinois.

On the first day of September, 1834, the defendants entered into the following bond to the United States, having executed the same under their respective hands and seals:

"Know all men by these presents, that we, J. P. B. Gratiot, Robert Burton, D. B. Moorehouse and Charles S. Hempstead, are holden, and stand firmly bound unto the United States of America, or their certain attorney, in the penal sum of ten thousand dollars, current money of the United States, well and truly to be paid unto their treasury; for which payment, well and truly to be made, we, the said J. P. B. Gratiot, Robert Burton, D. B. Moorehouse, and Charles

S. Hempstead, do hereby, jointly and severally, bind ourselves, our heirs, executors, and administrators, and each and every of them, jointly, severally, and firmly, by these presents. Signed with our hands, and sealed with our seals, this first day of September, in the year of our Lord one thousand eight hundred and thirty-four.

" The condition of the above obligation is such, that whereas the said J. P. B. Gratiot, and Robert Burton, have obtained from the agent of the United States a license, bearing date the first day of September, 1834, containing stipulations therein more particularly described, to smelt lead ore. Now, if the said J. P. B. Gratiot, and Robert Burton, shall faithfully and fully execute and comply with the terms and conditions set forth in said license, then, and in that case, this obligation to be void and of no effect, otherwise to remain in full force and virtue."

At the same time, a paper called a "License for Smelting," which was executed by Thomas C. Legate, major of the United States army, superintendent of the lead mines, J. P. B. Gratiot, and Robert Burton, under their hands and seals, was delivered to J. P. B. Gratiot, and Robert Burton, by Major Legate.

" This indenture, made and entered into this first day of September, 1834, between Major T. C. Legate, superintending the United States lead mines, acting under the direction of the Secretary of War, of the first part, and J. P. B. Gratiot, and Robert Burton, of the second part, witnesseth :

" That the said party of the second part, is hereby permitted, by and with the approbation of the President of the United States, to purchase and smelt lead ore at the United States' lead mines, on the Upper Mississippi, for the period of one year, from and after the date hereof, upon the following conditions, viz. :

" 1. All purchases, or other acquisitions of ore, ashes, zinc, or lead, to be from persons authorized to work the mines, either as lessees, smelters, or diggers, and from no others ; and no ore to be purchased from the leased premises of any person without his permission.

" 2. To commence smelting as soon as one hundred thousand pounds of ore are obtained, and to continue it so long as any is on hand ; to weigh a charge of ore for the log furnace, and the lead produced from it, when required to do it by the said first party, or his assistant.

" 3. To keep a book containing an accurate account of all ore, ashes, or zinc, purchased or otherwise acquired, and of all lead manufactured : which book shall, at all times, be open to inspection of the said first party, or his assistant ; and to furnish a transcript or return at the end of every month, (agreeably to a form furnished by the said first party ;) which book and returns to be verified on oath if required.

" 4. The said second party hereby agrees to pay the first party, for the use of the United States, six pounds of every hundred pounds of all the lead smelted by him, under this indenture, to be

paid monthly in clear, pure lead, at the wareroom on Fever river, or at such other place near the mines as the said first party shall direct, and free of expense to the United States. And the said second party is not to sell, or remove from the places of smelting, in any manner whatever, any lead, until the rent be paid as aforesaid. This condition is subject to the revocation of the government upon giving three months' previous notice; at which time, it will be optional with the licentiate to accept or refuse the new terms. Upon his refusal to accept, then this license shall cease and determine.

"5. The second party is allowed to have as much fuel as will suffice, without waste, for the purpose of this indenture; and to cultivate as much land as will suffice to furnish his teams, &c., with provender.

"6. It is understood and agreed between the aforesaid parties, that the said second party shall not employ, in any manner, any smelter, lessee, or miner, who has forfeited his license, lease, or permit to mine, nor any other person who is at the mines without the authority of the said first party; and the said second party agrees not to employ or harbour the labourers or workmen of another smelter. Sixty days are allowed after the expiration of this license, to close all business under it; but it is understood that no purchase, or hauling of ore is to take place after the license is expired. The bond given for the faithful performance of the contract is to be in full force and virtue until a written settlement is made.

"It is distinctly understood by the said parties, that upon proof being afforded to the first party, that either of the foregoing stipulations have been violated or not complied with, he may declare this indenture null and void, and re-enter and take possession of all the premises as if no such agreement existed."

In the Circuit Court of the United States for the District of Illinois, the United States instituted an action of debt to December term, 1836, against the defendants, on this bond. The declaration sets forth the bond and condition, and recites the license or contract therein mentioned, and avers that the lessees had, by virtue of the lease, smelted twenty-four hundred thousand pounds of lead, but had failed to execute the conditions stipulated on their part, by altogether refusing to pay to the superintendant, for the use of the United States, the six pounds for every hundred pounds so smelted.

The defendants demurred to the declaration, after oyer of the bond and licence for smelting; and on the argument of the demurrer, the following question arose, upon which the judges of the Circuit Court were divided in opinion, and directed it to be certified to this Court: "Whether the President had power, under the act of the 3d of March, 1807, (2 Story's Laws, 1065. 1068,) to make the contract set forth in the declaration."

The case was argued for the United States, by Mr. Gilpin, Attorney General; and by Mr. Benton, for the defendants.

Mr. Gilpin for the United States.

These lead mines—" the United States lead mines on the Upper Mississippi"—are situated on Fever river, partly within the northern portion of the state of Illinois, and partly in the territory of Wisconsin. They are of course within " the territory northwest of the river Ohio," ceded by Virginia to the United States, by the deed of cession, dated 1st March, 1784, (1 Story's Laws of the U. S. 472;) which deed ceded " the soil as well as the jurisdiction." In consequence of that cession, the old Congress passed their ordinance of 20th May, 1785, (1 Story's Laws of the U. S. 563,) for the survey and sale of the ceded lands. That ordinance, after directing the land to be surveyed into lots of one mile square, and all "springs, mines," &c. to be noted, authorized their exposure to public sale; but it directed that from such sale there "should be reserved, for the United States, four lots in each township;" and also, " one-third part of all gold, silver, copper, or lead mines, to be sold or disposed of as Congress should afterwards direct." The ordinance of 9th July, 1788, which repealed some portions of that of 1785, left these provisions in full force, up to the formation of the Constitution.

The third section of the fourth article of the Constitution provides, that "Congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States." This clause was legislated upon by the act of 18th May, 1796, (1 Story's Laws, 422, 423,) which provided for the survey and sale of a large portion of the northwestern territory. In the second section of that act, the surveyors were directed to note " all mines, salt-licks, salt-springs, and mill-seats;"— and by the third section, every salt-spring, and a mile square around it, and certain central sections of every township were excluded from sale, and "reserved for the future disposal of the United States." On the 10th May, 1800, (1 Story's Laws, 789,) an act supplementary to this was passed, which expressly provided " that the lands of the United States, reserved for future disposition, might be let on leases by the surveyor-general, for terms not exceeding seven years." When Ohio was formed into the first state in the northwestern territory, Congress stipulated, by the acts of 30th April, 1802, and 3d March, 1803, (2 Story's Laws, 870. 890,) that the reserved sections, and certain other sections of land then unsold, should be granted to the inhabitants for the use of schools, and that the legislature should hold them in trust for that exclusive purpose; that the reserved salt-springs should be granted " for the use of the people of the state," under such regulations as the legislature should direct: and that the same should never be sold, nor leased for a longer period than ten years." In the following year, an act was passed providing for "the disposal of the public lands in the Indiana territory," embracing therein the whole public domain from the boundary of the state of Ohio to the Mississippi, and reserving therein (2 Story's Laws, 929) a section in each township for schools, and " the several salt-springs in the said territory, together

with as many contiguous sections to each as might be deemed necessary by the President, for the future disposal of the United States." In 1807 an act was passed, (2 Story's Laws, 1065,) to prevent settlements on the public lands which "had not been previously sold, ceded, or leased" by the United States; but a provision was made in favour of such persons as had actually settled on them, by suffering them to remain, with the approbation of the President, as "tenants at will," on tracts not exceeding three hundred and twenty acres; provided, however, that where any such tract "included either a lead mine or a salt-spring, no permission to work the same should be granted without the approbation of the President, who was authorized to cause such mines or springs to be leased for a term not exceeding three years." Finally, on the 3d March, 1807, it was expressly provided, (2 Story's Laws, 1069,) that all the lead mines in the Indiana territory, with as many sections contiguous to each as were deemed necessary, should be reserved for future disposal; and the President has "authorized to lease any lead mine which had then or might thereafter be discovered in that territory, for a term not exceeding five years." This provision remained in full force, and unrepealed, up to the time when the present suit was instituted. It will thus be seen, that, from the cession of the northwestern territory, without interruption, down to 1807, Congress practised and sanctioned the plan of reserving from sale certain portions of the public domain; that they held them during an indefinite period for future disposition; and that this disposition consisted, either in selling them when no further reason for reserving them existed, or in ceding them to the states on certain conditions; or in leasing them under the control of the executive for short periods. This plan has been recognised by repeated subsequent enactments, at least as late as the year 1832. 2 Story's Laws, 1076. 1243. 1501.   3 Story's Laws, 1764. 1930.   4 Story's Laws, 2136. 2140. 2259. 2264.

The United States' lead mines on the Upper Mississippi, being within the Indiana territory, were early reserved from sale; and, in pursuance of the act of 3d March, 1807, leased for limited terms, under the direction of the President. At first the leases included particular mines, or lots of ground; but subsequently, the practice was introduced of leasing to some individuals the right to dig the ore on the reserved land, and to others the right to smelt it. Under this practice the contract set forth in the declaration was made. It consisted of two instruments: the one was, an agreement made between the superintendent of the lead mines. "acting under the direction of the Secretary of War," and "by and with the approbation of the President," and two of the defendants; by which they were "permitted to purchase and smelt lead ore at the mines, for the period of one year," paying therefor to the United States "six pounds of every hundred pounds of all the lead so smelted, at the wareroom on Fever river;" and also to have the necessary fuel, and to cultivate as much land as sufficed for the provender of their

[The United States *vs.* Gratiot et al.]

teams; the agreement was to be void, and the United States to have the right of immediate re-entry and possession, on non-compliance with these terms. The other instrument was an accompanying bond referred to in the agreement, with security conditioned for the fulfilment of these terms.

On the trial, the question arose " whether the President had power, under the act of 3d March, 1807, to make this contract." That the lands in question were " lead mines in the Indiana territory," is not denied. That they were reserved from sale is also admitted. That the contract was the act of the President, since it was made by a duly authorized agent, acting within the scope of his authority, is not disputed. Wilcox *vs.* Jackson, 13 Peters, 513. The only point therefore in controversy is, whether or not this contract is such an agreement as Congress meant, when they authorized the President " to lease any lead mine for a term not exceeding five years." A lease is a grant of the possession and usufruct of real estate, for a limited term, in consideration of a certain rent. This contract is in all respects such a grant; the lessee has the use of the land for cultivation and fuel, as far as it is needed; he has the use of the ore for the purpose of smelting; he is bound to pay a certain rent; and the grantors have a right of re-entry on certain contingencies. These are the incidents of a lease. Nor is it less a lease because a right to dig ore on the same premises may be granted to another. There is nothing in such a division of the profits of the leased land, which impairs or changes the nature of the contract. The duration of the term is in accordance with the act of Congress, for it is only for a single year. The contract, therefore, is such a lease as the President had authority to make.

It has been contended, that the Constitution confers no power to make such a contract, under the authority given to Congress to dispose of, and make rules and regulations respecting, the public territory; that the power of sale, and of such previous measures as are necessary for that purpose, and for ascertaining the value of the lands, is all the Constitution confers; and that to grant leases might have the effect of establishing a permanent tenantry within the states.

To this it may be answered, in the first place, that these considerations do not present themselves in the question now before this Court; they may be proper for the examination of the Circuit Court, on the further trial of the cause; but the only point here submitted is, whether or not the contract in question is a lease. Nor can the objections be sustained in themselves. If they have force, they apply against all reservations; much more, indeed, against such as are made for fortifications or public works; than these of the lead mines, since they are permanent; while these are, by their terms, merely reserved " for future disposal." Now it has been seen that the right of reservation has been exercised and acknowledged, without intermission, from the cession of the domain to the present time; before the Constitution was formed, as well as since. Even for the

admitted purpose of examination—for the prevention of a useless sacrifice of the lead mines—this course may be expedient. Nor can it be doubted that such a power is within the language of the Constitution. That language is unusually broad: "to dispose of, and to make all needful rules and regulations" respecting the public domain. Surely a power of lease, for a limited time, is embraced in language as broad as this. It has been held by this Court to give the widest scope to the action of Congress. M'Culloch *vs.* The State of Maryland, 4 Wheat. 422. American Ins. Co. *vs.* Canter, 1 Peters, 542. Under it, territorial governments of vast expense and complicated political powers have been formed; the whole management of the public domain rests upon these few words; lands have been ceded for special purposes; limitations have been fixed on the sovereign powers of the states; school lands are set aside; timber and salt-springs are kept for public use; and the spots on which many of our fortifications and public buildings are placed, are permanently secured. All this has been done, in repeated instances, for nearly sixty years. To confine the language of the Constitution, therefore, to a mere delegation to Congress of a power to sell the territory, or to examine and prepare it for sale, is evidently an unwarranted restriction upon it. If a wider authority be conferred, none would seem more legitimate than this limited and restricted power of leasing, for short periods, the mines that might from time to time be discovered. The inference, that it would lead to the establishment of a numerous tenantry within the states, is less an argument on the language of the Constitution than a supposition that Congress might wantonly abuse a delegated trust: it might be used with equal force against all the clauses of the Constitution, which give power to that body.

If, therefore, it be clear that the contract in question is a lease within the legal acceptation of the term, and the intention of the particular act; it is submitted, that there is nothing in the Constitution, or in the previous or subsequent legislation of Congress respecting the public domain, which made the execution of it improper or invalid.

Mr. Benton, for the defendants.

The position has been assumed by the Attorney General, that the United States may enter into the broad business of leasing the public lands; and, by consequence, that the President may have as many tenants on the public lands of the United States, as he shall desire; that he may lease in perpetuity, and have those tenants to the extent of time. Such a power is solemnly protested against. No authority in the cession of the public lands to the United States is given, but to dispose of them, and to make rules and regulations respecting the preparation of them for sale; for their preservation, and their sale.

As to the power to lease, which is claimed for the United States, what would the states have said, when the cession of these lands

was made and accepted, if it had been declared that the President could lease the lands; and that sixty years afterwards this Court would be engaged in enforcing a lease given by the United States of part of the lands then to be ceded? Would the lands have been granted, if Congress were to have the power to establish a tenantry to the United States upon them? The state rights principles would have resisted this; no lands would have been ceded.

The clause in the Constitution of the United States, relative to the public lands, will govern this question; and the deeds of cession go with the provisions of the Constitution. The lands are " to be disposed of " by Congress; not " held by the United States."

No question can be raised on the construction of the provision of the Constitution relative to the public lands. The Constitution gives the power of disposal; and disposal is not letting or leasing. The power to make rules and regulations, applies to the power to dispose of the lands. The rules are to carry the disposal into effect; to protect them; to explore them; to survey them. Congress have always treated the public lands on these principles.

Formerly the lead mines in the now state of Missouri were leased. This was while a territorial government existed there: when Missouri became a state, opposition was made to the system, and to the practice under it. They were successfully resisted, and the whole system was driven out of the state of Missouri. In that state there is no longer a body of tenantry, holding under leases from the United States.

The practice of leasing the lead mines then went into the territory of the United States above Missouri: into the territory of Illinois. It was resisted there, but ineffectually; this resistance cannot be sustained in a territory with equal force as it can be in a state. Illinois has become a state; and she will no longer allow this use of the public lands within her boundaries.

1. Congress has no power to give or authorize leases of the public lands, and to obtain profits from the working of the mines upon them.

2. Congress cannot delegate this power.

3. Congress has made no rule or regulation by which the contract on which this action is brought can be maintained.

In arguing these points it is insisted:

1. That the first act of March 3d, 1807, chap. 101, giving the President authority to lease lead mines, applies only to lands ceded to the United States by the Louisiana treaty, and to persons who had settled on such lands previous to the passage of the act; and was merely intended to induce such persons to acknowledge the title of the United States, and to become its tenants; and to give quiet possession, at the end of the lease, to the United States.

2. That the second act of March 3d, 1807, chap. 104, giving the President authority to reserve, for the future disposition of Congress, the lead mines of Indiana, and as many contiguous sections of land

2 Y 2

as he should think proper, and to lease the same for a limited period, was clearly intended to cause the mines to be explored, and their value ascertained, that Congress might afterward dispose of them with a knowledge of their value; and that the act contains no authority for any such license for smelting lead, with or without its various curious conditions, which forms the foundation for the contract disclosed in the record.

This act is limited to five years. It is not to be tolerated that this limitation is to be defeated by the renewal of the leases. The leases are to be given for mines which may be discovered. This is discovery by the surveyors of the United States. No mines are to be leased, but those which may thus become known. Private persons cannot seek for them, and then take leases of them.

The law provides that the "reserved lead mines" may be leased. But no lead mines have been reserved in the state of Illinois; and in the declaration there is an averment that there has been such a reservation. The case before the Court is not, therefore, within the provisions of the act of Congress; if the construction of the Constitution and the law shall, in the opinion of the Court, be such as would authorize leasing the lands of the United States. Those who execute a law, are to show that they are within its terms. Agents are to act within the granted authority. The agents of the government of the United States must show that the act of Congress has been followed.

To show that the agent of the United States has not followed his authority, will be to show he has not limited his authority. He styles himself "Agent of the United States' lead mines." This is the assertion of an agency over all the world! Where is the law authorizing the appointment of a superintendent of the lead mines? There is no law, nor is there an averment in the pleadings of such an authority.

The action of the agent is set forth in the record; not that he has granted a lease, but that he has granted a license. A license is not authorized. The license does not locate the person to whom it is given in any particular place. It gives him a right to go where he pleases. This is contrary to the usual forms of the law, and it interferes with the provisions of the land laws. The license is not to work mines; but "to purchase ore," "and lead," "and timber." All this is unauthorized by the acts of Congress.

It is a clear case on the policy of the law, and it is clear on the terms of the statutes, that the authority to lease is not given, and its exercise is invalid. 5 American State Papers, 560.

Mr. Justice THOMPSON delivered the opinion of the Court.

This case comes up from the Circuit Court of the United States for the District of Illinois. It is an action of debt founded on a bond given by the defendants to the United States, in the penalty of ten thousand dollars, bearing date the 1st of September, 1834, with a

condition thereunder written, for the performance of certain cove-nants or stipulations contained in an indenture referred to, and bear-ing even date with the bond, and called a license for smelting lead. The declaration sets out the condition of the bond, with the parts of the indenture referred to upon which breaches are alleged; and then assigns the breaches.

The defendants crave oyer of the bond, and the instrument or indenture referred to in the condition, and they are read to him as follows:

" Know all men by these presents, that we, J. P. B. Gratiot, Robert Burton, D. B. Moorehouse, and Charles S. Hempstead, are holden and stand firmly bound unto the United States of America, or their certain attorney, in the penal sum of ten thousand dollars, current money of the said United States, well and truly to be paid into their treasury; for which payment, well and truly to be made, we, the said J. P. B. Gratiot, Robert Burton, D. B. Moorehouse, and Charles S. Hempstead, do hereby, jointly and severally, bind our-selves, our heirs, executors, and administrators, and each and every of them, jointly, severally, and firmly, by these presents. Signed with our hands, and sealed with our seals, this first day of Septem-ber, in the year of our Lord one thousand eight hundred and thirty-four.

" The condition of the above obligation is such, that whereas the said J. P. B. Gratiot and Robert Burton have obtained from the agent of the United States a license, bearing date the first day of Septem-ber, 1834, containing stipulations therein more particularly de-scribed, to smelt lead ore: Now, if the said J. P. B. Gratiot and Robert Burton shall faithfully and fully execute and comply with the terms and conditions set forth in said license, then, and in that case, this obligation to be void and of no effect, otherwise to remain in full force and virtue.

|  |  |
|---|---|
| " J. P. B. GRATIOT, | [SEAL.] |
| ROBERT BURTON, | [SEAL.] |
| CHS. S. HEMPSTEAD, | [SEAL.] |
| J. B. MOOREHOUSE, | [SEAL.] |

" Witnesses present: GEO. GOLDTHROP,
PETER AYDELOTT,
ABRAHAM BLAYLEN."

" *License for Smelting.*

" This indenture made and entered into this first day of Septem-ber, 1834, between Major T. C. Legate, superintending the United States' lead mines, acting under the direction of the Secretary of War, of the first part, and J. P. B. Gratiot and Robert Burton, of the se-cond part, witnesseth:

" That the said party of the second part is hereby permitted, by and with the approbation of the President of the United States, to

purchase and smelt lead ore at the United States' lead mines, on the Upper Mississippi, for the period of one year, from and after the date hereof, upon the following condition, viz. :

" 1. All purchases or other acquisitions of ore, ashes, zinc, or lead, to be from persons authorized to work the mines, either as lessees, smelters, or diggers, and from no others ; and no ore to be purchased from the leased premises of any person without his permission.

" 2. To commence smelting as soon as one hundred thousand pounds of ore are obtained, and to continue it so long as any is on hand ; to weigh a charge of ore for the log-furnace, and the lead produced from it, when required to do it by the said first party or his assistant.

" 3. To keep a book containing an accurate account of all ore, ashes, or zinc, purchased or otherwise acquired, and of all lead manufactured : which book shall, at all times, be open to inspection of the said first party or his assistant ; and to furnish a transcript or return at the end of every month, agreeably to a form furnished by the said first party : which book and returns to be verified on oath if required.

" 4. The said second party hereby agrees to pay the first party, for the use of the United States, six pounds of every hundred pounds of all the lead smelted by him, under this indenture, to be paid monthly in clear, pure lead, at the wareroom on Fever river, or at such other place near the mines as the said first party shall direct, and free of expense to the United States. And the said second party is not to sell, or remove from the place of smelting, in any manner whatever, any lead, until the rent be paid as aforesaid. This condition is subject to the revocation of the government, upon giving three months' previous notice ; at which time, it will be optional with the licentiate to accept or refuse the new terms. Upon his refusal to accept, then this license shall cease and determine.

" 5. The second party is allowed to have as much fuel as will suffice, without waste, for the purpose of this indenture, and to cultivate as much land as will suffice to furnish his teams, &c., with provender.

" 6. It is understood and agreed, between the aforesaid parties, that the said second party shall not employ, in any manner, any smelter, lessee, or miner, who has forfeited his license, lease, or permit to mine, nor any other person who is at the mines without the authority of the said first party ; and the said second party agrees not to employ or harbour the labourers or workmen of another smelter. Sixty days are allowed, after the expiration of this license, to close all business under it ; but it is understood that no purchase or hauling of ore is to take place after the license is expired. The bond given for the faithful performance of the contract is to be in full force and virtue until a written settlement is made.

" It is distinctly understood by the said parties, that, upon proof being afforded to the first party that either of the foregoing stipulations have been violated or not complied with, he may declare this

[The United States *vs.* Gratiot et al.]

indenture null and void, and re-enter and take possession of all the premises as if no such agreement existed.

"Tho. C. Legate, [seal.]
Major U. S. Army, Sup. L. Mines.
J. P. B. Gratiot, [seal.]
Robert Burton, [seal.]
"Witnesses present: Geo. Goldthorp,
Peter Aydelott,
Abraham Blaylen."

Which being read and heard, the defendants interposed a general demurrer to the declaration; and upon the argument of the demurrer, the opinions of the judges were opposed upon the following point.

"Whether the President of the United States had power under the act of Congress of the 3d of March, 1807, to make the contract set forth in the declaration;" which point has been duly certified to this Court. The act of Congress referred to is entitled, "an act making provision for the disposal of the public lands situate between the United States military tract, and the Connecticut reserve, and for other purposes."

This act establishes a land office, and makes provisions for the disposal of the lands of the United States referred to in the title of the act; and among other things, the fifth section declares as follows:—"That the several lead mines in the Indiana territory, together with as many sections contiguous to each as shall be deemed necessary by the President of the United States, shall be reserved for the future disposal of the United States. And any grant which may hereafter be made, for a tract of land containing a lead mine, which had been discovered previous to the purchase of such tract from the United States, shall be considered fraudulent and null; and the President of the United States shall be, and is hereby authorized to lease any lead mine, which has been, or may hereafter be discovered in the Indiana territory for a term not exceeding five years." That the mines now in question lie within the territory referred to in the act of Congress, and are the property of the United States is not denied. And the Constitution of the United States (article four, section three) provides, "That Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property, belonging to the United States." The term territory, as here used, is merely descriptive of one kind of property; and is equivalent to the word lands. And Congress has the same power over it as over any other property belonging to the United States; and this power is vested in Congress without limitation; and has been considered the foundation upon which the territorial governments rest. In the case of M'Culloch *vs.* The State of Maryland, 4 Wheat. 422; the Chief Justice, in giving the opinion of the Court, speaking of this article, and the powers of Congress growing out of it, applies it to terri-

65

torial governments; and says, all admit their constitutionality. And again, in the case of the American Insurance Company *vs.* Canter, (1 Peters, 542 ;) in speaking of the cession of Florida under the treaty with Spain; he says, that Florida, until she shall become a state, continues to be a territory of the United States government, by that clause in the Constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property of the United States. If such are the powers of Congress over the lands belonging to the United States, the words " dispose of," cannot receive the construction contended for at the bar; that they vest in Congress the power only to sell, and not to lease such lands." The disposal must be left to the discretion of Congress. And there can be no apprehensions of any encroachments upon state rights, by the creation of a numerous tenantry within their borders; as has been so strenuously urged in the argument. The law of 1807, authorizing the leasing of the lead mines, was passed before Illinois was organized as a state ; and she cannot now complain of any disposition or regulation of the lead mines previously made by Congress. She surely cannot claim a right to the public lands within her limits. It has been the policy of the government, at all times in disposing of the public lands, to reserve the mines for the use of the United States. And their real value cannot be ascertained, without causing them to be explored and worked, under proper regulations. The authority given to the President to lease the lead mines, is limited to a term not exceeding five years; this limitation, however, is not to be construed as a prohibition to renew the leases from time to time, if he shall think proper so to do. The authority is limited to a short period, so as not to interfere with the power of Congress to make other disposition of the mines, should they think proper so to do. Does, then, the contract upon which the present action is founded, fall within the authority given to the President to lease the lead mines? Or, in other words, is this contract a lease within the meaning of the law. In construing this contract, the bond, and what is called " the license for smelting," are to be taken as parts of the same instrument; and purport to have been made by the defendants, with T. C. Legate, superintending the United States' lead mines, acting under the direction of the Secretary of War, who must be presumed to be acting under the authority of the President; especially as the permission given by the contract in terms, is said to be by and with the approbation of the President of the United States. This contract purports to be a license for smelting lead ore; and it is objected that this is not a lease within the meaning of the act of Congress. But this objection is not well founded. It is a contract for one year, and of course, within the time limited by the law, which gives to the President authority to lease for five years. Is it, then, a lease? The legal understanding of a lease for years is, a contract for the possession and profits of land for a determinate period, with the recompense of rent. The contract in question is strictly within this definition. The

[The United States *vs.* Gratiot et al.]

business of smelting is a part of the operation of mining, although it may be a distinct branch from that of digging the ore; but the law ought not to be so construed as to require the whole operation to be embraced in the same contract. They are different operations, requiring different qualifications, and distinct regulations. This contract is for the possession of land. The work is to be performed at the United States' lead mines, and must of course be performed within the limits prescribed by law to be attached to such mines. And there is an express permission to use as much fuel as is necessary to carry on the smelting business, and to cultivate as much land as will suffice to furnish teams, &c., with provender; and there is an express reservation of the rent of six pounds of every hundred pounds of lead smelted, with special and particular stipulation for securing the same. It is not necessary that the rent should be in money. If received in kind, it is rent, in contemplation of law.

We are accordingly of opinion, that the question certified in the record, must be answered in the affirmative.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Illinois, and on the point and question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this Court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that " the President had power, under the act of the 3d of March, 1807, to make the contract set forth in the declaration." Whereupon, it is ordered and adjudged by this Court, that it be so certified to the said Circuit Court accordingly.