UNITED STATES of America, Plaintiff,

v.

**Cliff GARDNER and Bertha Gardner, Defendants.**

No. CV–N–95–328–DWH.

United States District Court,
D. Nevada.

Oct. 2, 1995.

Greg Addington, Assistant U.S. Attorney, Kathryn E. Landreth, U.S. Attorney, Reno, NV, Brian L. Ferrell, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for plaintiff.

Glade Hall, Reno, NV, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HAGEN, District Judge.

Plaintiff has moved (# 7) for summary judgment. The matter has been fully briefed, argued and submitted for decision. The Court urged the parties to come to an accord and has delayed this decision in the hope they would. None having been reached, the matter will now be decided.

### Standard on a Motion for Summary Judgment

Summary Judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, *Zoslaw v. MCA Distr. Corp.*, 693 F.2d 870, 883 (9th Cir.1982), and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Baker v. Centennial Ins. Co.*, 970 F.2d 660, 662 (9th Cir.1992). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir.1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

> [T]here is no genuine issue of fact for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, if the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987).

### FINDINGS OF FACT

There is no genuine issue as to the following facts:

1. On February 2, 1848, the land that makes up the State of Nevada was ceded to the United States by Mexico in the Treaty of Guadalupe Hidalgo, 9 Stat. 922.

2. Article V of the Treaty defines the boundary line between the United States and Mexico which defines the territorial expanse of the two republics. *Id.* at 926–28. The Treaty, in relevant part, resulted in Mexico's cession of lands to the United States. These lands included the present day State of Nevada.

3. Since 1848, the United States has exercised its sovereign and proprietary rights over this property, including the imposition of certain tracts under the general land laws, the transfer of specific lands to the State of Nevada, and the reservation of other tracts for various purposes.

4. For example, in 1891, Congress authorized the President to "set apart and reserve" Forest Reserves from the public domain. 26 Stat. 1103. Beginning in 1906, the President used this authority to establish a number of forest reserves in Nevada. These reserves were soon consolidated into the Humboldt and Toiyabe National Forests.

5. On March 21, 1864, the United States Congress enacted the Nevada Statehood statute which authorized the residents of the Nevada Territory to elect representatives to a convention for the purpose of having Nevada join the Union. Nevada Statehood Act of March 21, 1864, 13 Stat. 30 (1864). Among its provisions, the Act granted certain tracts of United States' public lands to the State when it entered the Union. *See, Id.*, §§ 7–10 (1864).

6. In addition, the Nevada Statehood statute required the convention to adopt an

ordinance agreeing and declaring that the inhabitants of the Territory of Nevada "forever disclaim all right and title to the unappropriated public lands lying within said territory...." *Id.* at § 4.

7. Nevada's Constitutional convention accepted Congress's invitation to become a state and passed the Constitution of the State of Nevada, which includes an ordinance that states in relevant part:

> That the people inhabiting said territory do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States.

Ordinance of the Nevada Constitution, reprinted in 1 Nev.Rev.Stat. at 20 (1986).

8. The Nevada Constitution provides that this "ordinance shall be irrevocable, without the consent of the United States and the people of the State of Nevada." *Id.*

9. Upon receipt of the State Constitution ratified by the inhabitants of the Nevada Territory and the Ordinance disclaiming all unappropriated public lands in the Territory, the President of the United States, on October 31, 1864, proclaimed that Nevada had been admitted to the Union. *See,* 13 Stat. 749.

10. The National Forest System is administered by the Forest Service under various statutes. The organic Administration Act of 1897, 30 Stat. 34, 16 U.S.C. § 473 *et seq.,* provides that lands may be reserved as National Forests. That statute further provides that the Secretary of Agriculture may issue rules and regulations concerning the National Forests.

11. In 1906, the Secretary of Agriculture issued regulations requiring that persons desiring to graze stock in the National Forests first secure a permit to do so from the Forest Service.

12. The Granter–Thye Act of 1950, 64 Stat. 82, 88, provides independent authority for the Forest Service to issue permits for grazing on National Forest lands. Section 19 of that statute, 16 U.S.C. § 5801, states:

The Secretary of Agriculture in regulating grazing on the national forests ... is authorized, upon such terms and conditions as he may deem proper, to issue permits for the grazing of livestock for periods not exceeding ten years and renewals thereof: *Provided,* That nothing herein shall be construed as limiting or restricting any right, title or interest of the United States in any land or resources.

13. In 1976, Congress enacted the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* which requires the preparation of land and resource management plans for each unit of the National Forest System which shall form one integrated plan for such units. 16 U.S.C. § 1604(a), (f)(1). Among other things, NFMA requires that "permits ... for the use and occupation of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i).

14. In addition, Section 402(a) of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 90 Stat. 2743, 43 U.S.C. § 1752(a), provides that, subject to certain exceptions, livestock grazing permits issued for National Forests in the sixteen contiguous Western States shall be for a term of ten years. Section 402(a) further provides that such grazing permits shall be:

> subject to such terms and conditions the Secretary concerned deems appropriate and consistent with the governing law, including, but not limited to, the authority of the Secretary concerned to cancel, suspend, or modify a grazing permit or lease, in whole or in part, pursuant to the terms and conditions thereof, or to cancel or suspend a grazing permit or lease for any violation of a grazing regulation or of any term or condition of such grazing permit or lease.

15. The Department of Agriculture's regulations concerning grazing on National Forest System lands are published at 36 C.F.R. Part 222.

16. The regulations caution that grazing permits "convey no right, title or interest held by the United States in any lands or resources." 36 C.F.R. § 222.3(b). The regulations also state that the terms and condi-

tions of a grazing permit can be modified "to conform to current situations brought about by changes in law, regulation, executive order, development or revision of an allotment management plan, or other management needs." 36 C.F.R. § 222.4(a)(7).

17. In addition, the regulations provide, among other things, that the Forest Service may cancel or suspend, in whole or in part, any grazing permits "if the permittee does not comply with provisions and requirements in the grazing permit or the regulations of the Secretary of Agriculture on which the permit is based." 36 C.F.R. § 222.4(a)(4).

18. Grazing without Forest Service authorization on National Forest lands is subject to assessment of an "unauthorized grazing use" fee. 36 C.F.R. § 222.50(h).

19. Forest Service policy specifies that the rate for unauthorized use is based on the full commercial value of leased forage, unadjusted for differential operating costs for grazing National Forest System lands and leased private rangelands. Forest Service Manual at 2238.4. The unauthorized use rate also does not take into account contributions made by the permittee to construct or maintain improvements. *Id.*

20. In 1994 the unauthorized use rate for grazing cattle in the sixteen contiguous western states was $6.12 per "head month." Forest Service Manual at § 2238 (Interim Directive effective from Mar. 1, 1994—Mar. 1, 1995).

21. In 1988, the Forest Service issued a ten year grazing permit to the Gardners authorizing them to graze a certain number of cattle on specific allotments of the Humboldt National Forest, subject to the terms and conditions of the permit.

22. The Gardners were authorized to graze 294 cattle on the Mica C & H Allotment from May 1 to October 31, 53 cow/calf pairs on the Mica Creek Addition Allotment from May 1 to May 31, and 21 head of cattle on the Bureau C & H Allotment from April 16 to December 31.

23. Clause 3 of the permit stated in part that "[i]t is fully understood and agreed that *this permit may be suspended or cancelled, in whole or in part, after written notice, for failure to comply with any of the terms and conditions* specified in Parts 1, 2 and 3, hereof, or any of the regulations of the Secretary of Agriculture on which this permit is based, or the instructions of Forest officers issued thereunder...." (emphasis added). The permit was signed by defendant Cliff Gardner. The permit states, immediately above Mr. Gardner's signature, that "I **HAVE REVIEWED AND ACCEPT THE TERMS OF THIS PERMIT.**" (Emphasis in original).

24. On or about August 30, 1992, the Dawley Creek Fire consumed over 2,000 acres of land in the Mica C & H and Mica Creek Addition Allotments.

25. In October and November of 1992, the Forest Service and the Nevada Department of Wildlife reseeded 1,554 acres of the burned area at an approximate cost of $40,-000. The purpose of the reseeding was to revegetate the burned area which would eventually enable the resumption of grazing, would minimize the risk of soil erosion, and would create a buffer to prevent the spread of wildfires in the future onto private lands.

26. The Humboldt National Forest Land and Resource Management Plan ("LRMP") requires that a reseeded area be rested from livestock grazing for a period of two years in order to allow the vegetation to grow and develop. As noted above, NFMA requires that grazing permits be consistent with the land management plans. 16 U.S.C. § 1604(i). In accordance with the Humboldt LRMP, the Forest Service instructed the Gardners in September 1992 that the area burned by the Dawley Creek Fire would be closed to grazing in 1993 and 1994.

27. The Forest Service did offer the Gardners the use of a temporary electric fence which could be used to cordon off the burned area from the remainder of the permitted allotments. The Gardners declined this offer.

28. The Gardners complied with the Forest Service's instructions and did not graze their livestock on the area burned by the Dawley Creek Fire in 1993. Such was not the case in 1994, however.

29. On or about May 13, 1994, the Gardners informed the Forest Service in writing that they intended to resume grazing on the burned area three days later (on or about May 17, 1994) notwithstanding the Forest Service's direction to the contrary.

30. On or about May 18, 1994, the Forest Service observed that Gardners' cattle were grazing on the burned area.

31. On or about May 19, 1994, the Forest Service hand delivered a letter to the Gardners which notified them that grazing their livestock on the burned area was in violation of the terms and conditions of the permit, instructed them to remove their livestock from the burned area by May 23, 1994, and asked them to show cause why their grazing permit should not be cancelled by May 29, 1994.

32. On approximately June 9, 1994, following numerous attempts to obtain compliance with the terms of the then existing permit, pursuant to Forest Service regulations, the Forest Service cancelled the Gardners' permit, informed the Gardners that they would be billed for unauthorized grazing use at a rate of $6.12 per "head month" for the time the livestock remained on the Humboldt National Forest, and informed the Gardners that the cancellation decision was subject to administrative appeal.

33. Thereafter, on or about July 25, 1994, the Gardners informed the Forest Service that they would not appeal the cancellation decision.

34. Throughout the remainder of the 1994 grazing season, the Gardners continued to disregard the Forest Service's instruction that they remove their livestock from the Humboldt National Forest. The Gardners also failed to pay a bill of $4,473.72 to the Forest Service which represented the fee for unauthorized grazing use for 1994.

35. More recently, on or about May 3, 1995, the Gardners again placed their livestock on the Mica C & H Allotment without a permit.

36. On May 5, 1995, and then again on May 10, 12, 17, and June 1, 1995, the Forest Service requested that the Gardners remove their livestock from this allotment.

37. On June 1, 1995, the Forest Service also observed that the Gardners had placed two unauthorized structures on Forest Service property, apparently to aid their unauthorized grazing activity.

38. As of September 21, 1995, the Gardners have not removed their livestock notwithstanding the fact that they have no authorization to use this National Forest without written authorization. Further, the Gardners admit that they have no title to the land in question.

## CONCLUSIONS OF LAW

1. Rule 56(c) of the F.R.Civ.P. sets forth the standard for the granting of summary judgment. In pertinent part, Rule 56(c) provides that summary judgment may be granted if there are no genuine issues as to any material fact and that, as a matter of law, the moving party is entitled to summary judgement. F.R.Civ.P. 56(c). *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

2. The Treaty of Guadalupe Hidalgo, in relevant part, resulted in Mexico's cession of lands to the United States. *See, e.q., U.S. v. California*, 436 U.S. 32, 34 n. 3, 98 S.Ct. 1662, 1663 n. 3, 56 L.Ed.2d 94 (1978) (Supreme Court states that title to islands and mainland of California can be traced to Treaty of Guadalupe Hidalgo "by which Mexico ceded to the U.S. the islands lying off the coast of California"); *Cappaert v. U.S.*, 426 U.S. 128, 129, 96 S.Ct. 2062, 2065–66, 48 L.Ed.2d 523 (1976); *U.S. v. Ringrose*, 788 F.2d 638, 641 (9th Cir.1986); *State of New Mexico v. Aamodt*, 537 F.2d 1102, 1105 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Sanchez v. Taylor*, 377 F.2d 733, 735 (10th Cir.1967); *State of Nevada ex rel Shamberger v. U.S.*, 165 F.Supp. 600, 601 (D.Nev.1958).

3. These lands included the present day State of Nevada. *See, e.q., Sparrow v.*

*Strong,* 70 U.S. (3 Wall.) 97, 104, 18 L.Ed. 49 (1865) ("The Territory, of which Nevada is a part, was acquired by treaty").

■ 4. The United States retains and manages federal lands within the State of Nevada, including Humboldt National Forest, pursuant to its powers under the Constitution, primarily the Property Clause, which gives Congress the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2.

5. The Supreme Court has consistently interpreted this power to be extremely expansive, repeatedly observing that "the power over the public land thus entrusted to Congress is without limitations." *Kleppe v. New Mexico,* 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976); *United States v. San Francisco,* 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940). *See also, Alabama v. Texas,* 347 U.S. 272, 273, 74 S.Ct. 481, 481–82, 98 L.Ed. 689 (1954); *United States v. California,* 332 U.S. 19, 27, 67 S.Ct. 1658, 1662–63, 91 L.Ed. 1889 (1947); *Gibson v. Chouteau,* 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1871); and *United States v. Gratiot,* 39 U.S. (14 Pet.) 526, 537, 10 L.Ed. 573 (1840).

6. The Court has emphasized that Congress properly exercises "the powers of both a proprietor and of a legislature over the public domain." *Kleppe,* 426 U.S. at 540, 96 S.Ct. at 2292; *Alabama,* 347 U.S. at 273, 74 S.Ct. at 481–82.

7. The Gardners have no valid argument that the United State does not own the land at issue.

■ 8. There is no merit to the Garners' contention that title to the public lands automatically transferred to the State of Nevada at the time it was admitted into the Union under the Equal Footing Doctrine. The doctrine does not require equality in land ownership or economic resources, but instead simply requires that all states be given equal political rights and sovereignty. *United States v. Texas,* 339 U.S. 707, 716, 70 S.Ct. 918, 922–23, 94 L.Ed. 1221 (1950), *reh'g*

*denied,* 340 U.S. 907, 71 S.Ct. 277, 95 L.Ed. 656 (1950).

9. The doctrine exists to ensure that "each state shares 'those attributes essential to its equality in dignity and power with other states.'" *Nevada v. Watkins,* 914 F.2d 1545, 1554 (9th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991). (*quoting Coyle v. Oklahoma,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911)).

10. In discussing the Equal Footing Doctrine, the Supreme Court has recognized that each state, upon entering the Union, came with different amounts of land owned by the federal government. *Texas,* 339 U.S. at 716, 70 S.Ct. at 922–23. The Court has rejected the notion that this or other physical and economic differences were somehow precluded by the Equal Footing Doctrine: "The requirement of equal footing was designed not to wipe out these diversities but to create parity as respects political standing and sovereignty." *Id.*

■ 11. The Equal Footing Doctrine has a direct effect on property rights in only one limited way, and that is to transfer title to States upon their entry to the Union of tidelands and submerged lands underlying inland navigable waterways. *U.S. v. California,* 332 U.S. 19, 29–39, 67 S.Ct. 1658, 1663–69, 91 L.Ed. 1889 (1947).

12. This aspect of the doctrine has its roots in English common law which provided that the King had title in the soil of the sea below high water mark. (*Shively v. Bowlby,* 152 U.S. 1, 57, 14 S.Ct. 548, 569, 38 L.Ed. 331 (1894)). Because the Original 13 States were deemed to have the same right to these tidelands as the King, the Supreme Court held that new states should also have title to these submerged lands.

13. During the 1800s, the Supreme Court extended this Doctrine to include submerged land under navigable inland waterways not subject to the ebb and flow of the tide. [*See, e.g., Barney v. Keokuk,* 94 U.S. 324, 338, 24 L.Ed. 224 (1877); *Illinois Central Railroad v. Illinois,* 146 U.S. 387, 435–37, 13 S.Ct. 110, 111–12, 36 L.Ed. 1018 (1892).] The Court based this extension on its observation that the original rule was founded on the need for

public use of navigable waterways. Due to its particular factual settings, England happened to equate "tide waters" with "navigable waters." [*Illinois Central Railroad,* 146 U.S. at 436, 13 S.Ct. at 111.] In contrast, in the United States, there were tens of thousands of miles of navigable waterways not subject to the tide. Accordingly, the Court extended the Doctrine so that states were given title to land underlying all navigable waterways, whether or not subject to the tide. *See, Id.,* at 436–37, 13 S.Ct. at 111–12.

14. To the limited extent the Equal Footing Doctrine applies to proprietary rights, it derived from the English common law which gave the King title to lands that were subject to the ebb and flow of the tide. Upon the American revolution, the original states were deemed to have the same rights as the King in this regard, and thus had title to these tidal lands, which were to be held in trust for the public. *Id.* The Supreme Court held that all states to lands given the same sovereign rights as the original 13 states to lands which were subject to the ebb and flow of the tide. *Id.,* 152 U.S. at 57–58, 14 S.Ct. at 569–70.

15. The Equal Footing Doctrine does not, however, extend to upland territory. *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 473–76, 108 S.Ct. 791, 793–95, 98 L.Ed.2d 877 (1988). The *Phillips* decision made clear that the submerged lands subject to the Doctrine included both (a) submerged lands underlying navigable inland waterways and (b) coastal lands subject to the ebb and flow of the tide (whether or not underlying navigable water). *See, Id.*

16. In short, any argument that the Doctrine extends beyond submerged lands has no basis whatsoever. In fact, the Supreme Court has even refused to extend the Doctrine to all submerged lands. *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). With this decision, the Court limited the *Pollard* Doctrine to a subset of submerged lands. *See also, Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

17. Thus, there is absolutely no merit to the Gardners' contention that title to the public lands passed to the State of Nevada at the time of statehood.

■ 18. Similarly without merit is the Gardners' assertion that the United States has no authority to retain the public lands in its possession.

19. This proposition was long ago rejected by the Supreme Court. In *Light v. United States,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911), a rancher grazed his cattle on a National Forest without authorization. In his unsuccessful defense against the trespass action brought by the United States, the rancher argued that "Congress cannot constitutionally withdraw large bodies of land from settlement without the consent of the State where it is located." *Id.* at 535–36, 31 S.Ct. at 487–88.

20. The Supreme Court rejected this argument unequivocally. Beginning its discussion, the Court observed that its previous decisions had already established that the government "may deal with [its] lands precisely as an ordinary individual may deal with his farming property. It may sell or withhold them from sale." *Id.* at 536, 31 S.Ct. at 488 (quoting from *Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 866, 42 L.Ed. 260 (1897)).

21. Continuing its analysis, the Court set out the broad powers Congress has under the Property Clause of the Constitution, and held that Congress has the authority to retain or reserve the public lands, and pass laws to regulate those lands:

All public lands of the nation are held in trust for the people of the whole country. [citation omitted]. And it is not for the courts to say how that trust shall be administered. That is for Congress to determine. The courts cannot compel it to set aside lands for settlement; or to suffer them to be used for agricultural or grazing purposes; nor interfere when in the exercise of its discretion, Congress establishes a forest reserve for what it decides to be national and public purposes. In the same way and in the exercise of the same trust it may disestablish a reserve, and devote the property to some other national and public purpose. These rights are incident to pro-

prietorship, to say nothing of the United States as a sovereign over the property belonging to it."

*Id.,* 220 U.S. at 537, 31 S.Ct. at 488.

22. As *Light* reveals, the Gardners' theory was asserted and thoroughly rejected, over 80 years ago. *See also, Clackamas County, Oregon v. McKay,* 226 F.2d 343 (D.C.Cir.1955), *cert. denied,* 350 U.S. 904, 76 S.Ct. 183, 100 L.Ed. 794 (1955) (rejecting County's claim that the United States holds land "in trust or in receivership" for the State and thus could not retain land). These types of claims were also rejected by the Ninth Circuit much more recently. *United States v. Vogler,* 859 F.2d 638 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989) (The Ninth Circuit rejected miner's contentions that the United States had no authority to regulate public lands because the Property Clause was intended by the framers as a temporary provision and that the enclave clause within the Constitution only allows one of the enumerated powers granted to Congress in U.S. Const. Art. I, § 8, cl. 17.) *See also, State of Nevada v. United States,* 512 F.Supp. 166 (D.Nev.1981), *aff'd on other grounds,* 699 F.2d 486 (9th Cir.1983).

■ 23. The Gardners' contention that they have "acquired a vested grazing right through the common law, Common of Pasturage Doctrine" is without merit.

24. It is well-settled that historical grazing practices on public land was a privilege and conferred no legal right on the user. *Buford v. Houtz,* 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618 (1890); *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *Light v. United States,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *Omaechevarria v. State of Idaho,* 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (1918). *See also, Shannon v. United States,* 160 F. 870 (9th Cir.1908); *Bell v. Apache Maid Cattle Co.,* 94 F.2d 847 (9th Cir.1938); *Cliff Gardner & Bertha Gardner v. D. Waive Stager, et al.,* 892 F.Supp. 1301 (D.Nev.1995).

25. Given the unambiguous Supreme Court precedent, there can be no reasonable doubt that the National Forests, reserved from the public domain, are the property of the United States and rightfully managed by the Forest Service pursuant to federal law.

26. The United States thus has title and the right to administer the Humboldt National Forest.

■ 27. Trespass is defined as an entry upon real estate of another without the permission or invitation of the person lawfully entitled to possession. Restatement 2d of Torts, §§ 158–159.

28. It is well-settled that one who, without right, enters public lands of the United States is a trespasser, *Jones v. United States,* 195 F.2d 707 (9th Cir.1952), and that the United States, like any other private landholder, is entitled to protect its property against such trespassers. *See, Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 866, 42 L.Ed. 260 (1897); *Utah Power and Light Co. v. United States,* 243 U.S. 389, 404, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1916).

■ 29. The Gardners have willfully allowed their livestock to graze on the Humboldt National Forest in violation of federal law and regulation which require a written permit from the Forest Service and compliance with the permit's terms and conditions.

30. Such conduct constitutes a trespass— the intentional use of the property of another without authorization. W. Page Keaton et al., *Prosser and Keaton on the Law of Torts* § 13 at 70 (5th ed.1984); Restatement 2d of Torts, §§ 158–159.

■ 31. A necessity defense requires that four elements be satisfied: (1) they were faced with a choice of evils and chose the lesser evil; (2) they acted to prevent imminent harm; (3) they reasonably anticipated a direct causal relationship between their conduct and the harm to be averted; and (4) they had no legal alternatives to violating the law. *United States v. Schoon,* 955 F.2d 1238, 1239–40 (9th Cir.1991).

■ 32. The circumstances of the instant case certainly fall outside the realm of a necessity defense. Such a defense is wholly inconsistent with the Gardners' challenge to federal ownership of these lands. In order to raise a necessity defense, the Gard-

ners must assume that the federal government owns the lands and that the Gardners are in fact trespassing. However, the Gardners refuse to acknowledge federal ownership and therefore must forego such a defense.

 33. Even assuming that the Gardners were to recognize federal ownership of these federal public lands, the Gardners provide absolutely no evidence to support any of the elements of a necessity defense.

34. None of the Gardners' counsel's conjecture is supported by affidavit or otherwise.

35. In fact, nowhere within Cliff Gardner's lengthy affidavit is there anything that relates to a legally cognizable necessity to trespass upon the Humboldt National Forest.

36. In addition, the Gardners also fail to acknowledge that other legal remedies were available—an administrative appeal process, which they decided not to pursue.

37. Thus, the Gardners have failed to meet their burden of going forward with a necessity defense because "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell,* 758 F.2d 427 (9th Cir.1985).

38. No material issues of fact are in dispute and, after considering the well-established precedent supporting the legal issues presented here, the United States is entitled to summary judgment.

 39. Based upon this willful trespass, the United States is entitled to protect its property against this trespass by having a permanent injunction entered, the Gardners' cattle removed, and payment by the Gardners of the unauthorized grazing use fee of $7,030.41 as of September 8, 1995. *See, Light v. United States,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911). *See also, Camfield v. United States,* 167 U.S. 518, 524, 17 S.Ct. 864, 866–67, 42 L.Ed. 260 (1897); *Utah Power and Light Co. v. United States,* 243 U.S. 389, 404, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1916).

**IT IS THEREFORE ORDERED** that no material issues of fact are in dispute and, after considering the well-established precedent supporting the legal issues presented here, the United States motion for summary judgment (# 7) is *GRANTED.*

**IT IS FURTHER ORDERED** based upon the Gardners' willful trespass, the United States is entitled to protect its property against this trespass and a permanent injunction is hereby entered.

**IT IS FURTHER ORDERED** that the Gardners' cattle will be removed within twenty days of the date hereof, and payment by the Gardners of the unauthorized grazing use fee of $7,030.41 as of September 8, 1995, will be made to the United States within thirty (30) days of the date hereof. The Clerk shall enter judgment accordingly.