STATE OF TENNESSEE, Appellant,

v.

UNITED STATES of America (Southern Bell Tel. & Tel. Co. and Sevier County, Tenn.), Appellees.

UNITED STATES of America, Appellant,

v.

STATE OF TENNESSEE (Southern Bell Tel. & Tel. Co. and Sevier County, Tenn.), Appellees.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Appellant,

v.

UNITED STATES of America (State of Tenn. and Sevier County, Tenn.), Appellee.

SEVIER COUNTY, TENNESSEE, Appellant,

v.

STATE OF TENNESSEE (United States and Southern Bell Tel. & Tel. Co.), Appellees.

Nos. 12657–12660.

United States Court of Appeals
Sixth Circuit.
May 26, 1958.

Richard L. Carson and O. M. Tate, Jr., Knoxville, Tenn., and James Glasgow, Nashville, Tenn. (Richard L. Carson [of Tapp, Carson, Tate & Felts], Knoxville, Tenn., George F. McCanless, Nashville, Tenn., Jack Wilson, Chattanooga, Tenn., and James M. Glasgow, Asst. Atty. Gen., on the brief), for the State of Tennessee.

Fred W. Smith, Dept. of Justice, Washington, D. C. (Perry W. Morton, Washington, D. C., John C. Crawford, John F. Dugger, Knoxville, Tenn., and Roger P. Marquis, John C. Harrington, Washington, D. C., on the brief), for the United States.

J. O. Bass, Nashville, Tenn. (Thomas G. McConnell [of Frantz, McConnell & Seymour], Knoxville, Tenn., J. O. Bass [of Bass, Berry & Sims], Nashville, Tenn., E. W. Smith, John A. Boykin, Jr., and Graham W. George, Atlanta, Ga., on

the brief), for Southern Bell Tel. & Tel. Co.

R. R. Kramer, Knoxville, Tenn. (Andrew Johnson, Knoxville, Tenn., David M. Pack, Sevierville, Tenn., on the brief), for Sevier County, Tenn.

Before MARTIN and STEWART, Circuit Judges, and STARR, District Judge.

STARR, District Judge.

These four appeals were consolidated for hearing in this court, and for sake of brevity we shall refer to the United States of America as "the government," Southern Bell Telephone and Telegraph Company as "Southern Bell," the State of Tennessee as "the state," and Sevier county, Tennessee, as "the county."

The initial step in the litigation involved in these appeals was a civil action begun February 19, 1953, by the government at the request of the Secretary of the Interior against the state, the county, Southern Bell, and others. In the first count of its complaint the government sought to take by right of eminent domain "all rights, titles and interests not now held by the plaintiff" in certain land in Sevier county, Tennessee, for use in the establishment of a scenic parkway and highway connecting with the Great Smoky Mountains National Park, and for the ascertainment and award of just compensation to the owners and parties in interest. On the same date the government filed a declaration of taking and judgment was entered thereon, and the government deposited in the registry of the court the sum of one dollar as its estimate of just compensation for the outstanding "rights, titles and interests" in the lands taken. In the second count of its complaint the government sought to be exonerated or indemnified by the state against all damages and awards on account of the government's taking by condemnation of the right of way or easement claimed by Southern Bell for its telephone line along the public highway between the communities of Banner Bridge and Gatlinburg in Sevier county, Tennessee.

Before discussing the issues which subsequently became involved in this litigation, we shall narrate briefly the factual background out of which the litigation arose. It appears that prior to 1922 there was a narrow, curving, unimproved dirt road established by public user extending through the mountainous country between Banner Bridge and Gatlinburg. The state and county claim that in 1922 the county acquired by conveyance from abutting landowners an easement for highway purposes 40 feet in width, with such additional land as might be necessary, for the improvement, construction and maintenance of a public highway in approximately the same location as the former dirt road. The county then proceeded to grade, widen, gravel, and improve the highway between Banner Bridge and Gatlinburg, and some time prior to September 1, 1926, the state took over the maintenance of this county road. The state and county further claim that in 1928 the county acquired from abutting landowners easements for highway purposes over a strip of land "25 feet in width on each side of the center line" of the existing highway, thereby creating an easement 50 feet in width, and that the state then widened and blacktopped the traveled portion of the highway, which became a part of state highway No. 71.

In 1926 the Peoples Telephone Company, predecessor to Southern Bell, had constructed a public telephone line along state highway No. 71, a portion of which was located between Banner Bridge and Gatlinburg. In 1928 Southern Bell acquired the property and assets of the Peoples Telephone Company, including the telephone line between Banner Bridge and Gatlinburg, and it has continued to own, maintain, and operate the same.

It appears that in recent years there had been a great increase in vehicular traffic over highway 71 leading into the Great Smoky Mountains National Park; that the portion of the highway through the mountainous country between Banner Bridge and Gatlinburg at the park entrance was considered to be inadequate

and hazardous; and that it was necessary to widen and improve it in order to accommodate the increase in traffic. In pursuance of negotiations between the state and the government through its Public Roads Administration, it was proposed to create a scenic parkway and improved highway between Banner Bridge and Gatlinburg. In carrying out this plan the Congress in 1944 by statute (16 U.S.C.A. § 403h–11) authorized the Secretary of the Interior, on behalf of the government, to accept donations of land and interests in land in Tennessee for the construction of a scenic parkway connecting with the Great Smoky Mountains National Park. The act provided that the right of way to be acquired for the parkway should be of such width as to comprise an average of 125 acres per mile for its entire length, and also that all property so acquired would become a part of the national park and be subject to all laws, rules, and regulations applicable thereto.

Chapter 87 of the Tennessee Public Acts of 1945 authorized the state commissioner of highways and public works to acquire by donation, purchase or condemnation a right of way extending to the Smoky Mountains National Park and to acquire the lands necessary for the construction of a highway and scenic parkway. This act further provided that the state should pay for the rights of way and property so acquired from state-highway funds. In contemplation of the establishment of the parkway and the improvement of the highway, the state on June 27, 1946, submitted a proposal to the county relative to the acquisition of easements for rights of way along highway 71 extending from Sevierville to Gatlinburg, which included the highway between Banner Bridge and Gatlinburg, and this proposal was accepted by resolution of the Sevier county court. A copy of the proposal is hereto attached marked appendix A. Chapter 146 of the Tennessee Public Acts of 1947 provided that when the government, acting through the Public Roads Administration or the National Park Service, had entered into a written contract with the state to construct and maintain the scenic parkway and highway leading into the national park, the state commissioner of highways and public works was then authorized to convey to the government the rights of way acquired by the state, subject to certain reservations by the state. Chapter 26 of the Tennessee Public Acts of 1951 (1932 Tenn.Code § 3178.6, Tenn. Code Ann. § 54–306) authorized the commissioner of highways and public works of the state or any county of the state to acquire by eminent domain interest and title in lands to be used for the construction or reconstruction of any road, highway or parkway as might be deemed necessary, in order to secure Federal aid in such construction or reconstruction. Chapter 57 of the Tennessee Public Acts of 1951 authorized the state commissioner of highways and public works to convey to the United States all of the state's right, title, and interest in and to any and all state highways located on, over or within any lands which were a part of the Great Smoky Mountains National Park, and the highway between Banner Bridge and Gatlinburg would come within the provisions of this statute.

As a part of the program of the state and government for the establishment of the scenic parkway between Banner Bridge and Gatlinburg and the widening and improvement of the highway through the parkway, the state department of highways and public works and the government's Public Roads Administration and National Park Service entered into a cooperative agreement on April 1, 1948, a copy of which is hereto attached marked appendix B. It appears that in pursuance of their agreement (appendix A) the state and county cooperated in the acquisition of easements and rights of way for the widening and improvement of the highway between Sevierville and Banner Bridge. However, the government later required that fee title be acquired to the land comprising the proposed scenic parkway and highway between Banner Bridge and Gatlinburg,

and the state and county cooperated in acquiring that land, fee title to which was vested in the state. It appears from the testimony of the state highway department attorney that the county paid for this land and that the state reimbursed the county for two-thirds of the cost.

As a part of the cooperative program between the state and the government, the state on May 9, 1951, conveyed by deed to the government (government exhibit 16) the lands which it had acquired between Banner Bridge and Gatlinburg. This deed to the government was subject to certain reservations by the state, paragraph 5 thereof providing as follows:

"The State of Tennessee, grantor, reserves unto itself and its assigns the right to construct, use, and maintain a telephone line and a power line upon the land hereby conveyed, the said lines to extend from the boundary of said land near Banner Bridge to the boundary at the corporate limits of Gatlinburg, Tennessee, together with lateral lines necessary to serve areas outside the boundaries of said land, the said lines and laterals extending therefrom to be at such locations as the Director of the National Park Service may designate and to be constructed in such way or manner as the said Director may prescribe. In the event said Director shall direct that said telephone line be placed underground, then and in that event, the United States, acting through the National Park Service, shall provide a suitable earth shoulder extending along the parkway motor road to facilitate the placing underground of the said telephone line."

This deed from the state to the government also provided in paragraph 7 as follows:

"There is a telephone line and a power line both located upon or adjacent to the lands and right of way hereby conveyed and there is a dis-

agreement between the representatives of the telephone and power company and the proper officials of the State of Tennessee as to whether said lines are on the right of way herein conveyed or as to whether the companies maintaining said lines have a franchise or easement from the proper agencies of the State of Tennessee or of Sevier County to construct and maintain said lines. The State therefore obligates and binds itself to see to it that the owners of said lines remove the same from the land here conveyed within a reasonable time from the date of this instrument so that the construction of the parkway or highway over this property shall not be delayed and the development retarded. The State Highway authorities agree to settle this controversy with the authorities of the power lines and the telephone line without any cost to the grantee herein."

It appears that shortly prior to May 9, 1951, the date of the above-mentioned deed to the government, a conference was held between representatives of the National Park Service, the state, the county, and Southern Bell relative to the removal and relocation of its telephone line between Banner Bridge and Gatlinburg. The National Park Service required that the line be removed and either placed underground or reconstructed as a pole-line along the margin of the parkway right of way. At this conference Southern Bell declined to remove and relocate its line unless it was compensated for its expense in connection with such removal and relocation, and its refusal led to the litigation here involved between the government, the state, the county, and Southern Bell.

In furtherance of the plans and agreement for the construction by the government of the scenic parkway and highway between Banner Bridge and Gatlinburg, the government employed a construction company and work was begun and carried on to a point where it was necessary that a part of the telephone line and facilities

of Southern Bell be removed and relocated. Southern Bell refused to remove and relocate its line and in January 1953, began a suit in the state court against the construction company to enjoin it from molesting or interfering with the line. The action was removed to the United States district court, and on motion by the government the preliminary injunction which had been issued was conditionally dissolved upon the government's offer to provide a temporary location for the line during the construction of the parkway and highway. This action is being held in abeyance pending the determination of the present appeals.

As hereinbefore mentioned, the government filed complaint in the district court on February 19, 1953, in which it sought to take by right of eminent domain "all rights, titles and interests" not then held by it in the lands which it had acquired by deed from the state for scenic-parkway-and-highway purposes between Banner Bridge and Gatlinburg, and a judgment on declaration of taking was entered on the same date. It is apparent that the real purpose of the government's action was to obtain a determination of the right of Southern Bell to be compensated for the removal and permanent relocation of its telephone line between Banner Bridge and Gatlinburg.

Subsequent to the filing of its complaint the government and the state stipulated, pursuant to 40 U.S.C.A. § 258f, that there should be excluded from the property condemned in the government's action and from the declaration of taking, the reservation by the state of the right to construct and maintain a telephone line upon the lands conveyed to the government as provided in paragraph 5 hereinbefore quoted of the state's deed of May 9, 1951. In pursuance of this stipulation an order was entered in the district court excluding from the property condemned and taken by the government the rights and interests reserved to the state in paragraph 5 of its deed.

In the second count of its complaint the government asked for a judgment determining that it was entitled to be exonerated or indemnified by the state against all damages and awards on account of its taking the right of way or easement which Southern Bell claims for its telephone line between Banner Bridge and Gatlinburg. The government based its claim against the state on the ground that in paragraph 7 of the state's deed to the government hereinbefore quoted, the state had agreed to have the telephone line removed from the lands comprising the scenic parkway and highway and had agreed to settle the controversy with Southern Bell without any cost to the government.

In its answer to the first count of the government's complaint the state denied that Southern Bell had any compensable right, title or interest in the parkway-and-highway lands. In its answer the state further alleged in substance that the government by virtue of the state's deed of May 9, 1951, had acquired all rights, titles, and interests of the state and county in the lands comprising the scenic parkway and highway, subject only to the reservations by the state as provided in its deed. In its answer to the second count of the government's complaint the state denied that it had breached any of the covenants in its deed to the government relative to the removal of the telephone line from the parkway-and-highway lands, and it denied the government's right to exoneration or indemnification from liability.

The state also filed a cross-claim against its codefendant Southern Bell in which it asked for a decree that Southern Bell be required to remove its telephone line from its present location and relocate the same on the scenic parkway at its own expense. The state further asked that a mandatory injunction be issued requiring Southern Bell to so remove and relocate its telephone line at its own expense. With the court's permission, the state filed an amendment of its cross-claim against Southern Bell reading as follows:

"That the defendant, State of Tennessee, hereby tenders to the defend-

,ant, Southern Bell Telephone and Telegraph Company, the use and benefit of Reservation No. 5, as contained in that certain warranty deed dated May 9, 1951, wherein the defendant, State of Tennessee, is the grantor and the plaintiff, United States of America, is the grantee, same being recorded in the Register's office of Sevier County, Tennessee, in Warranty Book No. 106, pages 121–123, inclusive, subject to the provisions of Tennessee Code Sections 3094, et seq."

It may be noted that in this amendment of its cross-claim the state was tendering to Southern Bell the right which the state had reserved in paragraph 5 of its May 9, 1951, deed to the government, to construct and maintain a telephone line upon the lands included in the parkway and highway. It appears that the state has continued the tender of this right to Southern Bell and that Southern Bell has continued to refuse such tender.

In its answer to count 1 of the government's complaint Southern Bell alleged that prior to the filing of the complaint and declaration of taking on February 19, 1953, it was the owner of a perpetual and irrevocable easement or right of way for its telephone line between Banner Bridge and Gatlinburg, and that it was entitled to compensation for the value of said easement or right of way. It asked for a judgment of $5,398 as the cost of temporarily relocating a part of its telephone line in pursuance of the district court's order of March 6, 1953, and also for a determination of the compensation to which it is entitled for the taking of its claimed easement or right of way.

In its answer to the state's cross-claim Southern Bell denied that its telephone line was originally located on the public-highway right of way and alleged that its line was originally located off the right of way and on private land. In the alternative, it alleged that even if its line had been installed and maintained within the highway right of way, it nevertheless had a perpetual and irrevocable franchise or easement for the line. It alleged that

as the scenic parkway and highway are being constructed on land owned by the government, the state is without police power to compel the removal and relocation of its line. It further claimed that to require it to remove and relocate its line at its own expense would be unreasonable and arbitrary and in violation of its rights under the Federal and State Constitutions. It asked for judgment against the United States or the State of Tennessee or both, for the costs of removing and relocating its telephone line.

On November 18, 1953, the state filed a third-party complaint against its co-defendant Sevier county, in which it asked for judgment against the county for all sums for which it might be adjudged liable under the government's claim against the state asserted in the second count of the government's complaint. The state bases its claim for relief against the county on the ground that in its proposal to the county (appendix A), which was accepted, the county in effect agreed to save the state harmless from any suits which might be brought by reason of the state highway department's going upon the rights of way and land covered by easements, in connection with the improvement and construction of state highway No. 71 between Sevierville and Gatlinburg. In its answer to the state's complaint the county contended in substance that as the state had acquired fee title to the lands comprising the parkway and highway in question and had not acted in accordance with its proposal, which contemplated only the acquisition of rights of way and easements, the state had abandoned and waived any rights or claim it might have had against the county under said proposal. The county denied liability to the state under its complaint and denied liability to the government under the second count of its complaint, and also denied liability to Southern Bell.

The case was tried to the court without a jury, and the question considered at the first hearing in April, 1954, was whether or not Southern Bell was entitled to compensation for the taking of

its claimed telephone right of way or easement by the government. The district court held that it was not necessary to determine whether Southern Bell's telephone line was originally located on the highway right of way or on private lands; that regardless of the location of the line, it had an irrevocable easement in the land on which its line was located; and that such easement constituted a property right which could not be taken without compensation therefor. The court further held that as the lands on which the line was located had been conveyed by the state to the government, the easement could not legally be taken or impaired by the state under its police power; that the right of Southern Bell to locate and maintain its telephone line on the old existing highway right of way was statutory; and that such right was not abridged by the February 17, 1941, agreement hereinafter referred to, between Southern Bell and the state. The court further held that Southern Bell was not legally obligated to accept the state's tender of the right to relocate its telephone line on the scenic-parkway land under the state's reservation of the right to construct and maintain a telephone line on the land, as provided in paragraph 5 of the state's deed to the government. The district court further held that after the later determination of the amount of compensation to which Southern Bell was entitled, a judgment for that amount would be entered in its favor against the government, with judgment over in favor of the government against the state for two-thirds of said amount, and with judgment over in favor of the state against the county for one-third of said amount. Motions by the government, the state, and Southern Bell to amend and modify the trial court's findings of fact and conclusions of law were denied.

The case came on for a second hearing in the district court in February, 1955, upon the question as to the amount of compensation Southern Bell was entitled to recover, and on March 30, 1955, judgment was entered dismissing the state's cross-claim and awarding Southern Bell a judgment against the government in the amount of $23,882.14, which included the following items:

"1. The sum of $4,916.38, which represents the value of defendant's property insofar as included in the partial taking (temporary relocation) ordered by the Court on March 6, 1953.

"2. The sum of $585.97, which represents interest on the value of the partial taking from the date of the taking, as required by 40 U.S.C., Sec. 258a.

"3. The sum of $18,379.79, which represents the value of the additional taking of defendant's property, consummated and made final as of the date of this judgment."

The judgment of the district court further provided that the government should recover from the state two-thirds of said total award to Southern Bell, that is, the sum of $15,921.43, and that the state should recover from the county one-third of the total award, that is, the sum of $7,960.71.

The government, the state, the county, and Southern Bell have all appealed from the judgment entered in the district court, and these appeals were consolidated for hearing in this court. Following the presentation and argument of these appeals in June, 1956, this court entered an order, 235 F.2d 478, remanding the case to the district court for the making of additional findings of fact determining: Whether on February 19, 1953, when this action was begun, all of the poles and facilities of Southern Bell's telephone line between Banner Bridge and Gatlinburg were located within and upon the public-highway right of way or whether they were all located off the right of way, or whether some were located on and some located off the right of way. In case the district court determined as a fact that a part or portion of the poles and facilities were located on and a part or portion were located off the highway right of way, then the court was

directed to make a further finding of fact as to the approximate part or portion which were located on the right of way and the approximate part or portion located off the right of way. The district court was also directed, on the basis of its findings as to the location of the poles and facilities, to make a further finding of fact as to the amount of compensation, if any, which Southern Bell was entitled to recover, and also a finding as to the basis for its determination of such compensation.

In response to the order of remand the district court on November 2, 1956, filed its supplemental findings, stating in part as follows:

"3. In 1922, J. R. Maples and wife granted to Sevier County a road right-of-way 40 feet wide on which to construct a road not over 18 feet wide through the J. R. Maples farm. * * *

"5. On May 22, 1928, J. R. Maples granted to Sevier County a road right-of-way 25 feet wide on each side of the center line of the above-named Highway, * * * the result of which grant being to enlarge the original 40-foot right-of-way to a 50-foot right-of-way.

"6. On May 21, 1928, D. C. Maples by his guardian granted to Sevier County a right-of-way for a road, said right-of-way being 25 feet on each side of the center line.

"7. The rights-of-way granted by J. R. Maples and D. C. Maples adjoined each other lineally and together extended from Banner Bridge to Gatlinburg. * * *

"10. Said telephone line continued in approximately the same location from April 1, 1926, to the forced removal of the same as a result of inauguration of the road project involved in this litigation.

"11. From items 3, 5, 6, and 7 above, the inference is drawn that the road right-of-way across the D. C. Maples farm from 1922 to May 21, 1928, was, as in the case of the J. R. Maples farm, a 40-foot right-of-way.

"12. From and after May 21, and May 22, 1928, said right-of-way was 50 feet wide, being 25 feet on each side of the center line thereof.

"13. Prior to May 21, 1928, all telephone structures at a distance greater than 20 feet from the center line of said right-of-way were *off* said right-of-way.

"14. Prior to May 21, 1928, all telephone structures at a distance of 20 feet or less from the center line were *on* said right-of-way.

"15. From and after May 21 or May 22, 1928, all telephone structures at a distance greater than 25 feet from the center line were located *off* said right-of-way.

"16. From and after May 21 or May 22, 1928, all telephone structures at a distance of 25 feet or less from the center line were *on* said right-of-way.

"17. Prior to May 21, 1928, 16 of the total of 43 poles between Banner Bridge and Gatlinburg were located *off* the then existing 40-foot right-of-way.

"18. Prior to May 21, 1928, 27 of the total of 43 poles were located *on* said right-of-way.

"19. From and after May 21 or May 22, 1928, 7 of said poles were located *off* the then existing 50-foot right-of-way.

"20. From and after May 21 or May 22, 1928, 36 of said poles were located on the then existing 50-foot right-of-way.

"21. As between cost of construction, removal, relocation and related matters for poles located off the right-of-way and those located on the right-of-way, no substantial difference per pole is indicated.

"22. Damages heretofore awarded Southern Bell in the sum of $23,-296.17, exclusive of interest, with a single pole used as the price index,

is the basis for finding the damages allocated to poles located off the right-of-way and the damages allocated to those on the right-of-way.

"23. The unit price on a per-pole basis with the total damage represented by the number 43 is $541.77.

"24. With the legal question involved left unanswered, damages represented by poles located off the right-of-way prior to May 21, 1928, are found by multiplying $541.77 by 16, and damages represented by poles located off the right-of-way after May 21 or May 22, 1928, are found by multiplying $541.77 by 7. (See items 17 and 19 above.)

"25. By like procedure the damages allocable to poles located on the right-of-way prior to May 21, 1928, are found by multiplying $541.77 by 27, and damages allocable to poles located on the right-of-way after May 21 or May 22, 1928, are found by multiplying $541.77 by 36. (See items 18 and 20 above.)

"26. For reasons implicit in the foregoing items, the allocations are found in the alternative, with tabulations as follows:

| "BASED ON THE SITUATION AS IT EXISTED | DAMAGES ALLO-CATED TO POLES OFF R/W | DAMAGES ALLO-CATED TO POLES ON R/W |
| --- | --- | --- |
| Prior to May 21, 1928 | $8,668.34 | $14,627.83 |
| After May 21 or 22, 1928 | $3,792.40 | $19,503.77 |

"27. The legal question heretofore referred to as one left unanswered is as follows: As to those poles located off the right-of-way prior to May 21, 1928, did the telephone company acquire a prescriptive easement that was superior to the subsequently acquired highway right-of-way?"

Southern Bell contends that the district court erred in its supplemental findings of fact as to the location of the poles of its telephone line as originally built by the Peoples Telephone Company in 1926. It contends that, with the possible exception of five poles, its telephone line was originally located on private land, entirely outside the boundaries of any public-highway right of way, and that its line has continued in approximately the same location until the present condemnation suit was instituted. Southern Bell also contends in effect that regardless of whether its line was originally located on private property or on the public-highway right of way, it has an irrevocable easement which cannot be taken by the government or the state without compensation. It further contends that the court adopted an erroneous measure of damages, and that the correct measure of the damages it is entitled to recover for the removal and permanent relocation of its telephone line would be the cost of a new telephone line to replace the segment to be removed between Banner Bridge and Gatlinburg, less the depreciation which existed in the old line and less salvage.

The government and the state and county all contend that the trial court erred in its findings of fact as to the location of the telephone poles between Banner Bridge and Gatlinburg in relation to the highway right of way, both prior and subsequent to May 21, 1928. They contend that the entire telephone line in question as constructed by the Peoples Company in 1926 was located on the county-highway right of way and that Southern Bell as successor to the Peoples Company is not entitled to be compensated for the removal and permanent relocation of its line.

Southern Bell contends that it acquired certain rights through the taking over by

Peoples Telephone Company of a private telephone line owned by one Goddard. This contention is without merit, as the testimony reasonably establishes that the Goddard line was abandoned or destroyed or, as one witness said, "all shot to pieces" by the improvement and construction of the road in 1922. In any event, the evidence establishes that the Peoples Telephone Company did not build a new telephone line until 1926; that this line was taken over by Southern Bell in 1928; and that the telephone poles, at the time the present action was commenced, were located in approximately the same positions as originally located in 1926.

■ The first question to be determined is whether Southern Bell is entitled to compensation for the temporary relocation of a part of its telephone line between Banner Bridge and Gatlinburg. On March 6, 1953, the district court ordered Southern Bell to move a part of its line to a temporary, free location offered by the government, so as to permit the construction of the scenic parkway and highway to proceed and to maintain uninterrupted telephone service over the line. This temporary relocation of a part of the line was at the request of the government, and it is admitted that Southern Bell is entitled to recover the reasonable expense incident thereto. Southern Bell asserts a claim of $5,397.38 as its net expense for the temporary removal, reconstruction, and rearrangement of a part of its line. In computing its claim Southern Bell allowed a credit of only $429 for depreciation on the removed line. The evidence reasonably establishes a depreciation of $910, which reduces the claim to $4,916.38, which is the amount the trial court determined Southern Bell was entitled to recover. We believe this determination was correct, and we affirm the trial court's holding that Southern Bell is entitled to recover from the government the sum of $4,916.38 as its reasonable expense incident to the temporary relocation of a part of its line. As the state in paragraph 7 of its conveyance of the scenic-parkway-and-highway lands to the government expressly agreed to have the telephone line removed from the land conveyed, and agreed to settle the controversy with Southern Bell without any cost to the government, we conclude that the government should recover the entire sum of $4,916.38 from the state. The government required the temporary relocation of part of the line in order that it could proceed with the construction of the scenic parkway and highway, and this temporary relocation of the line was certainly never contemplated at the time the state and county entered into their agreement (appendix A) relating to the acquisition of rights of way and easements. From examination of all testimony and exhibits we conclude that the state is not entitled to recover any part of said sum of $4,916.38 from the county.

We next turn to the question of whether or not Southern Bell can legally be compelled to remove and relocate its present telephone line between Banner Bridge and Gatlinburg. The line was constructed by Southern Bell's predecessor, the Peoples Telephone Company, under authority of 1932 Tenn.Code, §§ 3094 and 3095 (Tenn.Code Ann. §§ 65–2105, 65–2106), which provide as follows:

§ 3094: "Any person or corporation organized for the purpose of transmitting intelligence by magnetic telegraph or telephone, or other system of transmitting intelligence the equivalent thereof, which may be invented or discovered, may construct, operate, and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of cities and towns, or across and under the waters, and over any lands or public works belonging to this state, and on and over the lands of private individuals, and upon, along, and parallel to any of the railroads, and on and over the bridges, trestles, or structures of said railroads."

§ 3095: "*But the ordinary use of such public highways*, streets, works, railroads, bridges, trestles, or struc-

tures, *shall not be thereby obstructed,* nor the navigation of said waters impeded, and just damages shall be paid to the owners of such lands, railroads, and turnpikes, * * * by said telegraph or telephone corporations."

The evidence establishes that the telephone line at the time this action was commenced obstructed the ordinary use and the necessary widening and improvement of the public highway between Banner Bridge and Gatlinburg, made necessary by the greatly increased vehicular traffic to and from the national park. The evidence amply supports the following finding of fact by the trial court:

"3. * * * It appears from the evidence in this cause to be undisputed that said existing roadway or highway was a narrow, dangerous, hazardous, winding and mountainous roadway and that it was necessary for the same to be widened, enlarged, and improved in order to accommodate the increasingly heavy vehicular traffic, and the telephone poles and facilities *as constructed and maintained did obstruct the widening, improving and constructing of the roadway or parkway by the Federal Government.* The increase in the traffic was brought about principally as a result of the establishment of the Great Smoky Mountain National Park and the visitation of the general public thereto."

It should be kept in mind that in its conveyance on May 9, 1951, of the parkway-and-highway lands to the government, the state in paragraph 5 expressly reserved to itself and its assigns the right to construct, use, and maintain a telephone line extending from Banner Bridge to Gatlinburg upon the lands conveyed, and this reservation further provided that the line should be at such location and constructed in such a way as the director of the National Park Service might designate. As hereinbefore explained, the government and the state stipulated that there should be excluded from the property condemned in the government's action and from the declaration of taking the above-mentioned reservation by the state of the right to construct and maintain a telephone line on the land.

■ In the present action the government has condemned and taken "all rights, titles and interests" not held by it in the lands in question, and the state by its cross-claim against Southern Bell seeks to compel the removal and permanent relocation of the existing telephone line. Southern Bell contends that as the lands included in the new scenic parkway, over which the improved highway will run, are now owned by the government, the state is without police power to compel the removal and relocation of its telephone line, and it also contends that the government does not have police power to require such removal. This contention is without merit, as the telephone line was originally constructed and established under the permissive right granted by state statutes, §§ 3094, 3095, hereinbefore quoted, which provided that a telephone line should not obstruct the ordinary use of the state's public highways. The widening and improvement of the highway here in question were necessary for the safety and general welfare of the people of Tennessee, and the state could not bargain or give away its police power to establish regulations reasonably necessary for the safety and welfare of its people. Chicago, Milwaukee & St. Paul Railway Company v. City of Minneapolis, 232 U.S. 430, 440, 34 S.Ct. 400, 58 L.Ed. 671; Southern Bell Tel. & Tel. Co. v. Commonwealth, Ky., 266 S.W.2d 308, 311, 312. In Atlantic Coast Line Railroad Company v. City of Goldsboro, North Carolina, 232 U.S. 548, 558, 559, 34 S.Ct. 364, 368, 58 L.Ed. 721, the court said:

"For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this

(police) power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. In re Slaughter-House Cases, 16 Wall. 36, 62, 21 L.Ed. 394; Munn v. State of Illinois, 94 U.S. 113, 125, 24 L.Ed. 77, 84; Beer Co. v. Massachusetts, 97 U.S. 25, 33, 24 L.Ed. 989, 992; Mugler v. State of Kansas, 123 U.S. 623, 665, 8 S.Ct. 273, 31 L.Ed. 205, 211; Crowley v. Christensen, 137 U.S. 86, 89, 11 S.Ct. 13, 34 L.Ed. 620, 621; New York & N. E. R. Co. v. Town of Bristol, 151 U.S. 556, 567, 14 S.Ct. 437, 38 L.Ed. 269; Texas & N. O. R. Co. v. Miller, 221 U.S. 408, 414, 415, 31 S.Ct. 534, 55 L.Ed. 789, 795, 796. And the enforcement of uncompensated obedience to a regulation established under this power for the public health or safety is not an unconstitutional taking of property without compensation or without due process of law. Chicago, Burlington & Q. Railroad v. City of Chicago, 166 U.S. 226, 255, 17 S.Ct. 581, 41 L.Ed. 979, 991; New Orleans Gas Light Co. v. Drainage Commission, 197 U.S. 453, 462, 25 S. Ct. 471, 49 L.Ed. 831, 835; Chicago B. & Q. Ry. Co. v. People of State of Illinois, 200 U.S. 561, 591, 592, 26 S.Ct. 340."

By transferring the title to the lands in question to the government for national-park purposes, the state did not divest itself of its right to use the public highway, and the beneficial rights of the people of Tennessee were in no way impaired. Malone v. Peay, 159 Tenn. 321, 327, 17 S.W.2d 901. The case of State ex rel. v. Oliver, 162 Tenn. 100, 35 S.W. 2d 396, involved the acquisition by the state of land to be transferred to the government for inclusion in the Great Smoky Mountains National Park, and in approving the acquisition and transfer, the court said in 162 Tenn. at page 109, 35 S.W.2d at page 398:

"We can perceive no reason why a public use, or a public necessity, may not be common to Tennessee and to the United States, just as such a use or necessity may be common to the state and the county or to the state and the city. * * *

" * * * Our people will enjoy every advantage from this park operated by the federal government that they would enjoy if it were operated by our own state."

See also Yarborough v. North Carolina Park Commission, 196 N.C. 284, 145 S.E. 563.

The state may properly utilize Federal facilities to accomplish its necessary road-improvement program, and we perceive no sound reason why the state's police power should not be exercised in conjunction with the government's right of eminent domain. Furthermore, the government, by virtue of its power to regulate the use of government lands, could undoubtedly require relocation of the telephone line over its lands. In Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 157, 40 S.Ct. 106, 108, 64 L.Ed. 194, the court said:

"That the United States lacks the police power, and that this was reserved to the states by the Tenth Amendment, is true. But it is none the less true that when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose. * * * If the nature and conditions of a restriction upon the use or disposition of property is such that a state could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation."

■ Since Congress has the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States" (Constitution, art. 4, § 3, cl. 2), this power of the United States, analogous to the police power of a state, is clearly applicable where the lands of the United States are concerned. Federal Power Commission v. Idaho Power Co., 344 U. S. 17, 21, 73 S.Ct. 85, 97 L.Ed. 15; McKelvey v. United States, 260 U.S. 353, 359, 43 S.Ct. 132, 67 L.Ed. 301; Utah Power & Light Co. v. United States, 243 U.S. 389, 403–405, 37 S.Ct. 387, 61 L.Ed. 791; Camfield v. United States, 167 U. S. 518, 525, 17 S.Ct. 864, 42 L.Ed. 260; United States v. Gratiot, 14 Pet. 526, 536, 537, 39 U.S. 526, 536, 537, 10 L.Ed. 573.

■■ The telephone line here in question was originally located by permission granted by state statute, and the law is well established that a statutory, permissive right of use of public highways by public utilities is subordinate to the rights of the public; that the original location of poles or other facilities in a public highway does not create an irrevocable right to have such poles and facilities remain forever in the same place; and that a utility company may be required to relocate its lines at its own expense when such relocation is demanded by public necessity and for public safety and welfare. Erie Railroad Co. v. Board of Public Utility Commissioners, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322; Western Union Telegraph Co. v. City of Richmond, 224 U.S. 160, 32 S.Ct. 449, 56 L.Ed. 710; New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U.S. 453, 460–462, 25 S.Ct. 471, 49 L.Ed. 831; People ex rel. New York Electric Lines Co. v. Squire, 145 U.S. 175, 187–191, 12 S.Ct. 880, 36 L.Ed. 666; Ganz v. Ohio Postal Telegraph Cable Co., 6 Cir., 140 F. 692, 694–696; Duquesne Light Co. v. City of Pittsburgh, 251 Pa. 557, 565–567, 97 A. 85. See also discussion and authorities cited, 52 Am.Jur. § 28, pp. 57, 58, § 34, p. 64; 25 Am.Jur. § 182, pp. 479–481.

In the present case the widening and improvement of the public highway and the construction of the scenic parkway were to be made upon lands which the state had conveyed to the government with certain reservations of state rights, including the right to construct and maintain a telephone line. The state and the county bore the expense of obtaining fee title to the land required for the construction of the scenic parkway and the widening and improvement of the highway, and the government was to improve the highway and construct the parkway at its own expense. There is no logical or legal distinction between the present situation, where the government bears the full expense of the necessary widening and improvement of the highway, and the usual Federal-aid project where the costs of the right of way and highway improvement are divided on some basis between the state and the government.

It appears that on February 17, 1941, the state and Southern Bell had entered into an agreement, paragraph 6 of which provided as follows:

"If, at any future time, the public interest of the State, in the opinion of the Commissioner of Highways and Public Works, requiring it, it should become necessary, in the maintenance, construction or reconstruction of said highway, to have the above mentioned appliances and facilities relocated in order that said highway may be properly maintained or reconstructed, or in the event said appliances and facilities should, at any time, unreasonably interfere with the use of said highway, First Party (Southern Bell) agrees, upon being requested so to do by Second Party (state), to relocate appliances and facilities at its own expense to some other convenient point upon said highway, and without cost to Second Party, the State of Tennessee, or any agency of said State."

Southern Bell contends that this agreement applied only to the future construction and extension of its telephone facil-

ities and is not applicable to the removal and relocation of the telephone line in question originally established in 1926. However, it can be argued with considerable force that the state and Southern Bell, by their course of dealings, placed their own construction upon this contract and treated it as applicable to all highway improvements where it was necessary to remove and relocate telephone lines. It is significant that in many highway-widening-and-improvement projects in the state, Southern Bell had removed and relocated its telephone lines at its own expense. A right-of-way engineer of the state highway department testified as follows:

"Q. * * * Mr. Thomas, enumerate to the Court the different projects that have been Federal aid projects where telephone lines and facilities were on the State or the public right-of-way which have been widened or improved in which the telephone company, to your knowledge, has removed and relocated at their own expense since 1941 in your area? A. Well, I have one project between Jacksboro and LaFollette. There is another one from Claxton School to South Clinton.

"Q. * * * The first one was in Campbell County? A. Yes. Other in Anderson. * * *

"One in Sevier County between Pigeon Forge and Sevierville. * *

"Then * * * Roane County from Rockwood toward Kingston, Clinch River Bridge. Then there is one in Morristown. That is Hamblen County. * * *

"Over here on Warden Avenue, Maryville, in Blount County. I don't know just how many could be named.

"Q. How about eastern extension of Magnolia Avenue in Knoxville? A. Had that, too.

"Q. Were all those that you have named here Federal aid projects whereby the Federal Government was contributing to the cost of the constructed highway? A. They were contributing to the cost of construction plus one-third of the acquisition of the rights-of-way.

"Q. On the Clinton Highway that you referred to in Anderson County, tell the Court whether or not in that case the Federal Government contributed all of the cost of construction? A. That's right."

■ Furthermore, it appears from the testimony that in connection with the widening and improvement of that part of state highway 71 between Sevierville and Pigeon Forge which adjoins the new scenic parkway and highway, Southern Bell relocated its telephone line at its own expense. In the above instances of highway improvements throughout the state, Southern Bell recognized its legal obligation under the law and under its contract with the state to remove its telephone lines at its own expense, and did remove the same at its own expense. In the present case there is the same legal obligation upon Southern Bell to remove and permanently relocate at its own expense that part of its telephone line between Banner Bridge and Gatlinburg which was originally located upon the public-highway right of way.

A similar state statute and a factual situation comparable to that involved in the present case was considered in Southern Bell Tel. & Tel. Co. v. Commonwealth, Ky., 266 S.W.2d 308. In 1886 the Kentucky legislature created the Ohio Valley Telephone Company (a predecessor of Southern Bell) as a corporation with the right to construct and maintain telephone lines over and under the highways, streets, and alleys of the state. The right conferred was not confined to any particular highways, but related to highways in existence at the time of the grant and those thereafter constructed. The legislative act expressly provided that the telephone lines and poles should be constructed, equipped, and maintained over or under the highways, streets, and alleys *"so as not to obstruct the same."* A proceeding was begun in 1953 to deter-

mine whether or not Southern Bell was required to bear the expense of the relocation of its poles, wires, and conduits situated upon certain highways, which relocation was made necessary by the construction of the Watterson expressway. In affirming the lower court's decision that the cost of such relocation should be paid by Southern Bell, the court said in part, 266 S.W.2d at pages 309–311:

"The Watterson Expressway is a new limited access Federal-aid highway. It has been planned and is being constructed to connect U.S. highways 42, 60, 31E, and 31W in such a way as to enable traffic to proceed from either of said highways to the other without going through the business section of the city of Louisville. One-third of the right of way cost and one-half of the construction cost are to be paid by the Federal government. The new highway crosses, at various points, numerous established highways upon which Southern Bell has for many years maintained its poles, wires, and conduits. At certain points, it includes for a short distance portions of previously established public highways. At such points, it is necessary that the telephone company's facilities be removed and relocated in order to construct the new Expressway.

"* * * The parties are not in complete agreement concerning the exact nature of the property right conferred by the legislative grant, but we do not think this question is material. Whatever its nature, whether real, personal, or mixed, tangible or intangible, it amounts to an irrevocable, perpetual legislative franchise to maintain poles and lines upon any or all highways in the Commonwealth in such a manner as to afford no obstruction to public use. * * *

"We think, fairly and reasonably construed, the removal and reloca-

tion of the poles and lines at appellant's expense may be justified under the specific provisions of the grant. The term 'so as not to obstruct the same' unquestionably relates to the obstruction of improvement, construction, and reconstruction of the state's highways as well as obstruction of travel upon completed highways. * * *

"Aside from the express provisions of the grant, we think there is a clearly implied condition that appellant may be required to remove and relocate its facilities when such removal and relocation are in the interest of public convenience or safety. * * *

"It is also insisted that the provisions of appellant's franchise constitute a valid contract with the state and that enforcement of the demand that appellant remove and relocate its facilities at its own expense amounts to impairment of the terms of a contract. We have previously indicated that we do not think the terms of the franchise, express or implied, are inconsistent with the state's demand. We also think that if our construction was otherwise the state might nevertheless enforce the removal and relocation requirement under authority of its police power."

In the case of Southern Bell Telephone and Telegraph Co. v. State ex rel. Ervin, Fla., 75 So.2d 796, 799, the court said:

"The statute authorizes the Telephone Company to use the roads or highways for its facilities so long as such facilities shall not obstruct or interfere with the common uses of said streets. Even if the proviso in the act had been omitted, it would not have conferred upon the company any absolute or indefeasible right to have such facilities remain in the same place forever. In the only instance, cited supra (Peninsular Telephone Company v. Marks, 144 Fla. 652, 198 So. 330), where this statute

has been before this Court, we held that streets are primarily for the benefit of the traveling public, and that the use of such streets by Telephone Companies was secondary and restricted to the extent that such facilities should not interfere with the common uses thereof. The streets were built first and when the Telephone Company installed its facilities in the streets it did so knowing that if it became necessary in the future to improve such streets in the interest of the general welfare, its facilities would have to be moved, relocated or rearranged. In other words, it knew then that its facilities and business was then and always would be subservient to the rights of the public."

See also City of Macon v. Southern Bell Tel. & Tel. Co., 89 Ga.App. 252, 79 S.E.2d 265, 273; County Court of Wyoming County v. White, 79 W.Va. 475, 91 S.E. 350, L.R.A.1917D, 660.

The cases of City of Chattanooga v. Tennessee Electric Power Co., 172 Tenn. 524, 112 S.W.2d 385; Board of Mayor, etc., of City of Morristown, Tenn. v. East Tennessee Telephone Co., 6 Cir., 115 F. 304; and Southern Bell Tel. & Tel. Co. v. City of Nashville, 35 Tenn.App. 207, 243 S.W.2d 617, are cited as authority for the contention that Southern Bell had an irrevocable easement in the highway right of way on which a part of its telephone line was originally located. Examination of these authorities clearly indicates that they do not sustain this contention, and on the basis of the facts and legal issues involved they are clearly distinguishable from the present case. In the City of Chattanooga and Board of Mayor cases, the question presented was whether a municipality could legally cancel the right of a utility company to maintain its lines in the public streets. While holding that the municipality could not absolutely cancel a franchise to maintain telephone lines in the streets, the court nevertheless stated in the Board of Mayor case (115 F. at page 309) that the tele-

phone company's rights were "subject to the reasonable regulations of the municipality by virtue of its police power." In Southern Bell Tel. & Tel. Co. v. City of Nashville, supra, the decision turned upon the point that the attempted exercise of police power was discriminatory as between the several utility companies affected.

In Grand Trunk Western Railway Co. v. City of South Bend, 227 U.S. 544, 33 S.Ct. 303, 57 L.Ed. 633, cited by Southern Bell, the only question involved was whether the city could repeal an ordinance granting the railroad the right to construct its tracks upon a certain street in the city. While holding that the ordinance could not be revoked, the court nevertheless recognized the city's right to regulate and control its streets.

It may be noted that the foregoing and other authorities cited by Southern Bell do not involve sections 3094 and 3095 of the 1932 Tennessee Code or similar state statutes. The court has examined the case of Rogers v. City of Knoxville, Tenn. App., 289 S.W.2d 868, cited by the state in its supplemental brief. The factual situation involved in that case distinguishes it from the present case, and the decision is not determinative of any material issues involved in these appeals. We have also examined ch. 170, Tenn.Pub. Acts of 1957, Tenn.Code Ann.1957 cum. supp. § 54-543 et seq., and such statutory provisions appear to have no application to the issues involved in the present appeals.

In summary, the telephone line here in question was originally established under the permissive right granted by state statutes, Tenn.Code, §§ 3094, 3095, hereinbefore quoted, which expressly provide that "the ordinary use of such public highways * * * shall not be thereby obstructed * * * by said telegraph or telephone corporations," and it clearly appears as found by the trial court that Southern Bell's telephone line does obstruct the ordinary use and the necessary widening and improvement of the highway between Banner Bridge

and Gatlinburg. From consideration of all evidence presented and the foregoing authorities we conclude that the state retained its police power, which could be exercised in conjunction with the power of the Federal government, to require Southern Bell to remove and relocate its telephone line between Banner Bridge and Gatlinburg.

We next turn to Southern Bell's contention that it is entitled to recover compensation for the taking by the government of its claimed easement for its existing telephone line between Banner Bridge and Gatlinburg and for the necessary expense incident to the removal and relocation of its line. This requires a determination of the original location of the telephone poles on the line in 1926 and what permanent easements, if any, it had over the public-highway right of way and over the adjoining land of private-property owners. The evidence establishes that the poles of Southern Bell's line between Banner Bridge and Gatlinburg were located in approximately the same positions when this action was commenced on February 19, 1953, as they were originally located by its predecessor the Peoples Telephone Company in 1926. The government, the state, and the county all contend that the entire telephone line as constructed in 1926 was located within the boundaries of an existing 40-foot highway right of way. On the other hand, Southern Bell contends in its brief that the line constructed by its predecessor in 1926, with the possible exception of five poles, was located outside the highway right of way and on private land.

It appears that prior to 1922 the narrow dirt road between Banner Bridge and Gatlinburg, which had been established by public user, was across the land of only two property owners, that is, J. R. Maples and D. C. Maples. On April 4, 1922, J. R. Maples and wife conveyed to the county a right of way and easement for highway purposes 40 feet in width over their land (state exhibit 8). The government, state, and county seem to assume that in 1922 the county also ac-

quired a 40-foot right of way and easement for highway purposes over the land of D. C. Maples, and in paragraph 11 of his supplemental findings the district judge concluded that the county had such a right of way over the D. C. Maples land. However, the testimony and exhibits do not show any conveyance to the county by D. C. Maples of a 40-foot right of way and easement over his land in 1922 or at any time prior to the establishment of the line by the Peoples Telephone Company in 1926. In the absence of a conveyance by D. C. Maples of a 40-foot right of way and easement over his land, it cannot legally be assumed or inferred that such a right of way existed. We accordingly conclude that when the Peoples Telephone Company established its line in 1926, the county had a right of way and easement 40 feet in width over the J. R. Maples land, but did not have a 40-foot right of way and easement over the D. C. Maples land. The only right which the county had over the D. C. Maples land in 1926 was the right established by user to the existing traveled roadway, which at that time was approximately 16 feet in width.

On April 30, 1926, J. R. Maples conveyed to the county an easement and right of way for highway purposes 30 feet in width over his land, and that deed (state exhibit 9) and relevant testimony clearly indicate that it was given only for the purpose of widening the traveled portion of the 40-foot right of way. In May, 1928, J. R. Maples, and D. C. Maples by his guardian, conveyed to the county rights of way and easements for highway purposes over their lands, 25 feet in width on each side of the center line of the then-existing highway. By these conveyances the county acquired a 50-foot right of way and easement for highway purposes between Banner Bridge and Gatlinburg. However, these conveyances in 1928 did not affect the rights of the Peoples Telephone Company, which had established its line in 1926.

Although the conveyance of the 40-foot right of way and easement by J. R. Maples and wife in 1922 was not recorded

until 1929, it clearly appears from the testimony that when the Peoples Company established its line in 1926, it assumed that the county had a right of way over said land. Witness A. A. Simpson, who was general superintendent of the Peoples Telephone Company in 1926 and who had had charge of the construction of the line between Banner Bridge and Gatlinburg, testified regarding the location of that line as follows:

"Q. Did you stake where poles were to go? A. Yes, sir. See, what we did, we tried to line them as much as we could to cut out corners.

"Q. At that time, of course, Mr. Simpson, there was a highway going up through from Pigeon Forge to Gatlinburg up the gorge there, was there not, of the Little Pigeon River? A. Yes, sir.

"Q. I will ask you if that highway was not being improved and worked on at the time you built that line? A. As well as I remember, there was a few places where they were widening it some. * * *

"Q. * * * Where did you locate your line or pole with reference to the highway and right-of-way? A. Well, I tell you, that was through those mountains, considered more or less with us, than just a country road, and our plans were always to stay on road right-of-way where we could.

"Q. Is that what you were trying to do in this instance? A. As much as we could, yes, sir; but we get back—we got back lots of places, but I figured some day it would be a main highway through there and would be widened, and some places I considered this—that it didn't make much difference where you put poles up there. It wasn't like building around through a cultivated country, you see, because most of that territory wasn't hardly fit for telephone line or road either. Lots of places, as I say, we get back maybe a little off of the right-of-way in order to keep the line straight and cut out as many corners as possible. In fact, hard to tell where the right-of-way was. * * *

"Q. But it was your intent and purpose to put it on the right-of-way? A. As much as we could; yes, sir. * * *

"To the best of my recollection, the line is [in] about the same location as it was first located."

■ It is generally recognized that the location of a telephone line is determined by the location of its poles, and therefore the rights of Southern Bell in this action depend upon where its predecessor, the Peoples Telephone Company, located its telephone line in 1926. The best evidence as to where the line was originally located appears from a survey made about 1951 to determine the location of the poles in relation to the center line of the paved roadway, which measurements are shown in exhibit A attached to a stipulation by the parties.

On the basis of those measurements the district court determined in its supplemental findings that prior to May 21, 1928, 16 of the total of 43 poles between Banner Bridge and Gatlinburg were located off the then-existing 40-foot highway right of way and that 27 poles were located on the right of way. However, this finding was based on the erroneous assumption that prior to May 21, 1928, the county had a right of way and easement 40 feet in width over both the J. R. Maples and D. C. Maples lands. As hereinbefore explained, prior to May 21, 1928, the county had a 40-foot right of way and easement over the J. R. Maples land, but had only the right established by user to the existing traveled roadway, about 16 feet in width, over the D. C. Maples land.

■ From the testimony and from maps and other exhibits it appears that in 1926, 5 telephone poles were located on the 40-foot right of way over the J. R. Maples land and 10 poles were located on the private land of J. R. Maples, and that 28 poles were located on the private

land of D. C. Maples. Using the original location of the poles as a basis for determining the location of the telephone line between Banner Bridge and Gatlinburg, it may therefore reasonably be said that 5/43 of the line was originally located on the 40-foot highway right of way and 38/43 of the line was located off the right of way and on private lands. It is clear that Southern Bell had acquired an easement or right of way over the private lands on which 38/43 of its telephone line was originally located in 1926. 1932 Tenn.Code §§ 3094, 3095; Jones v. Southern Bell Tel. & Tel. Co. (decided June 29, 1956), Tenn.App.; Doty v. American Telephone & Telegraph Co., 123 Tenn. 329, 130 S.W. 1053. The government, the state, and the county admit that Southern Bell is entitled to be compensated for its reasonable expense incident to the removal and permanent relocation of that part of its telephone line between Banner Bridge and Gatlinburg which was originally located off the highway right of way and on private lands, and the amount of such compensation will be discussed and determined later in this opinion.

■ We shall next determine the question of Southern Bell's right to compensation for the removal and relocation of the 5/43 of its telephone line which was originally located on the 40-foot right of way which J. R. Maples and wife had conveyed to the county in 1922. From consideration of the evidence presented and the many authorities hereinbefore cited and discussed, we conclude that Southern Bell is not entitled to recover compensation for the removal and relocation of the 5/43 of its telephone line originally located on the 40-foot right of way and easement over the J. R. Maples land. The required removal without compensation of the 5/43 of its line which was originally located on the public-highway right of way does not deprive Southern Bell of its property without due process of law and equal protection of the laws.

■ We have hereinbefore determined that Southern Bell is entitled to recover compensation for the removal and relocation of that part of its telephone line which was originally located outside the 40-foot highway right of way and on privately owned land. We have also determined that on the basis of the location of the poles, 38/43 of the line was located off the highway right of way and on private land. Therefore, it must be determined what amount of compensation Southern Bell is entitled to recover for the removal and relocation of said 38/43 of its line. As a practical matter this can only be ascertained by determining the reasonable expense of removing and relocating the entire line between Banner Bridge and Gatlinburg less depreciation and salvage, and allowing 38/43 of that amount as the compensation to which Southern Bell is entitled for removing and relocating that part of its line which was originally located on private lands. Southern Bell contends that it cannot permanently locate its lines on the parkway land now owned by the government for the reason that the government will not grant it a permanent easement, and for the further reason that the line must be constructed and maintained at such location as the director of the National Park Service may designate and be constructed in such manner as the director may prescribe. We recognize, and the state concedes, that Southern Bell cannot be compelled to accept the state's tender of the right, which it had reserved in paragraph 5 of its May 9, 1951, deed to the government to locate a telephone line upon the scenic-parkway-and-highway lands.

■ As Southern Bell had an easement and right of way for the 38/43 of its telephone line which was originally located on private lands, it seems clear that the compensatory value of that easement would be the reasonable expense incident to the permanent relocation of that part of its telephone line on private lands. The present telephone line is a so-called pole-line, and in determining the reasonable expense incident to the relocation of 38/43 of the line, we should consider only the expense incident to the

construction of a pole-line on private land, affording comparable facilities. In its determination of damages to which Southern Bell was entitled for the removal and permanent relocation of its line, the district court subtracted the depreciated value of the old line from the cost of relocating the line. However, it is conceded by all parties that this was incorrect, and that the correct measure of damages would be the cost of removal and permanent relocation of the line less the depreciation that existed in the old line and less salvage.

▆▆ Southern Bell has presented evidence (So. Bell exhibit 1) that the expense incident to removing the entire telephone line between Banner Bridge and Gatlinburg and relocating it on private land outside the boundaries of the scenic parkway, less salvage and depreciation on the old line, is the sum of $26,660. The state has presented evidence (state exhibit 14) consisting of five plans for the removal and permanent relocation of the line, and plan 5 providing for a pole-line on private land shows a cost, including exchange circuits added prior to the beginning of this action, of $15,389.79. From examination of all testimony and exhibits we are convinced that the evidence presented by Southern Bell shows a more practicable plan for relocating the telephone line, and a more accurate and realistic figure as to the cost of the removal and permanent relocation of the line so as to afford comparable facilities. City of Fort Worth, Tex. v. United States, 5 Cir., 212 F.2d 474; Town of Clarksville, Va. v. United States, 4 Cir., 198 F.2d 238; United States v. Brooklyn Union Gas Co., 2 Cir., 168 F.2d 391; Jefferson County, Tenn. v. Tennessee Valley Authority, 6 Cir., 146 F.2d 564.

▆▆ As 38/43 of the present line was originally located on private land outside the highway right of way, we conclude that Southern Bell is entitled to recover from the government 38/43 of its removal-and-replacement costs of $26,660, that is, the sum of $23,560. As the state in

paragraph 7 of its May 9, 1951, deed to the government of the land comprising the parkway and highway expressly agreed to have the telephone line removed from the land conveyed and agreed to settle the controversy with Southern Bell without cost to the government, we hold that the government is entitled to recover the full sum of $23,560 from the state. We now turn to the question of whether or not the state is entitled to recover any part of this sum from the county. In June, 1946, the state and county had entered into an agreement (appendix A) relating to the acquisition of rights of way and easements for the reconstruction and improvement of the state highway between Sevierville and Gatlinburg, which included the highway between Banner Bridge and Gatlinburg. Although the performance of that agreement was somewhat changed, in that the government later required that fee title be acquired to the lands comprising the scenic parkway and highway, it nevertheless appears that the county cooperated with the state in acquiring fee title to the lands and generally participated with the state and government in carrying out the plans for the establishment of the scenic parkway and the widening and improvement of the highway thereon. From examination of the cooperative agreement between the state and the Public Roads Administration and the National Park Service (appendix B) and the prior agreement between the state and the county, and from consideration of all testimony, we are convinced that the state should recover from the county one-third of said sum of $23,560, that is, the sum of $7,853.33.

In summary, for the reasons hereinbefore stated we conclude as follows: (1) That Southern Bell is entitled to recover from the government the sum of $4,916.38 as compensation for the temporary relocation of a part of its telephone line in order to permit the government to proceed with the construction of the scenic parkway and highway, plus interest at the rate of 6 per cent per annum (40 U.S.C.A. § 258a); (2) that the gov-

ernment is entitled to recover said full sum of $4,916.38 and interest from the state; (3) that the state is not entitled to recover any part of said sum of $4,916.38 and interest from the county; (4) that Southern Bell is required to remove its telephone line from its present location and relocate the same; (5) that Southern Bell is entitled to recover from the government the sum of $23,560 as compensation for the removal and permanent relocation of that part of its telephone line which was originally in 1926 located off the public-highway right of way and on private land; (6) that the government is entitled to recover said sum of $23,560 from the state; (7) that the state is entitled to recover from the county one-third of said sum of $23,560, that is, the sum of $7,853.33; (8) that Southern Bell is not entitled to recover compensation for the removal and permanent relocation of that part of its telephone line which was originally in 1926 located on the 40-foot highway right of way over the J. R. Maples land.

The judgment of the district court is affirmed in part and reversed in part as herein provided, and the case is remanded to the district court for the entry of judgment in accordance with this opinion.

We should state that our findings and conclusions on these appeals are based upon the particular facts and circumstances involved in this case.

Appendix A.

"Proposal of the Department of Highways and Public Works of the State of Tennessee, Under the Direction of the Commissioner of Highways and Public Works, to Sevier County, Tennessee.

———

"To the Honorable County Court of Sevier County, Tennessee:

"Whereas, The Department of Highways and Public Works of the State of Tennessee, hereinafter called 'Department,' has tentatively allocated certain State and Federal funds for the construction of the following described project in Sevier County, Tennessee, hereinafter called 'County,' known and designated as Project Sevier County, provided said County will co-operate with said Department in the acquisition of the rights-of-way for the same:

"The reconstruction of that part of State Highway No. 71 beginning at the city limits of Sevierville and extending to the end of the concrete in Gatlinburg.

"Now, Therefore, Said Department hereby proposes to said County that:

"1. If said County will acquire for said Department the rights-of-way and easements shown on the blue prints and photostats which accompany this proposal, said rights-of-way to be free of obstructions, buildings and improvements, and said rights-of-way to be acquired without cost to said Department or to the State of Tennessee, except as hereinafter set out; and

"2. If said County will agree to save said Department and the State of Tennessee harmless from any and all suits which may be brought by reason of the Department going upon said rights-of-way and the land covered by said easements and taking the same for the purpose of constructing said project, and by reason of the Department changing the grade and widening the existing highway; and

"3. If said County will agree to remove, or have the owners of the same remove, all telephone, telegraph, light and power poles or towers, and all water, gas and sewer mains or pipes, located upon existing rights-of-way of highways or roads, which may be encountered during the construction of said section of

highway, without cost, now or hereafter, to the State of Tennessee, the said Department, or the Federal Government; and,

"4. If said County will agree that all signs, markings and traffic signals hereafter installed or placed at any point upon or above the right-of-way of said project, by said County or any other public authority or agency, shall be subject to the approval of said Department and the Public Roads Administration of the United States of America before such installation shall be made; and,

"5. If said County will waive any and all rights that it may have under the provisions of Chapter 57 of the Public Acts of 1931, or any Act or Acts which may be passed relative to the payment for rights-of-way by said Department or by the State, or relative to the reimbursement of the counties of the State by said Department or by the State for the costs of rights-of-way, and will waive the estimating by said Department of the approximate damage and cost of said rights-of-way;

"The Department will, as soon as practicable after this proposal is accepted and the necessary rights-of-way are acquired, take bids for the construction of said project, and construct the same with Federal and State funds.

"Under the 'Federal-Aid Highway Act of 1944' [58 Stat. 838] the Federal Government may assume the payment of one-third of the cost of rights-of-way, and said Department hereby agrees that, after said rights-of-way are acquired by the County and the Department is furnished with such papers as may be required by the Federal Government in order for the Department to secure from the Federal Government the payment of the Federal Government's portion of the cost of said rights-of-

way, said Department will pay to the County such sum as it receives as the Federal Government's contribution towards the purchase of said rights-of-way, together with an equal amount to be paid from State funds under the control of said Department.

"The Department and the Federal Government will not participate in paying for the removing of utilities occupying existing rights-of-way of highways or roads, salaries or fees of County employees, officials, appraisers, or attorneys engaged in acquiring rights-of-way, passing on titles, preparing abstracts, etc., nor for land belonging to said County or an arm or agency of the same; participation being limited to amounts paid to the property owners for rights-of-way taken and incidental damages, and for the removing of buildings and improvements. All rights-of-way will have to be appraised by a representative of the County, a representative of the Department, and a citizen of the County not connected with the Department or the County as an employee or official, and the appraisals must be approved by the Federal Government prior to the purchase of the same; and no purchase shall be made at a price in excess of the approved appraised price. If any right-of-way can not be acquired by purchase at not to exceed the approved appraised price, the same will have to be condemned.

"When said project is completed and accepted such parts of the present highway as are not destroyed, but are replaced by said project, will be taken off of the State System and turned over to the County for future maintenance.

"The location and routing of said highway, the names of the property owners, the location and extent of the right-of-way to be taken from

each property owner, the improvements to be affected by the construction of said project, and the buildings to be removed, the grade of the proposed highway and the grade of the present highway at places where the proposed highway follows the present highway, and the above referred to telephone, telegraph, light and power poles or towers are shown in detail on the blue prints and photostats which accompany this proposal.

"It is required of said County that this proposal be accepted, by proper resolution of the Quarterly County Court of said County, on or before the 1st day of July, 1946; otherwise the same shall become null and void.

"Entered of Record and Effective as of the 27th day of June, 1946."

### Appendix B.

"Cooperative Agreement for the programming of funds and the construction of roads to give access to the Great Smoky Mountains National Park from the Knoxville area in Tennessee.

"Witnesseth:

"Whereas, the Great Smoky Mountains National Park in Eastern Tennessee is one of the outstanding tourist attractions in the eastern area; and

"Whereas, it is expected that there will be a great increase in traffic and tourist trade that will mean much to the State and to the National Parks if adequate access and scenic highway accommodations are provided; and

"Whereas, the present roads leading from the Knoxville area via Sevierville and Maryville are totally inadequate and hazardous even for present traffic.

"Now, Therefore, in order to provide adequate, safe, and attractive highways to meet present and antici-pated traffic needs, it is mutually agreed that a program of construction of approach and access roads from the Knoxville area to the Great Smoky Mountains National Park will be undertaken jointly and in cooperation by and between the State of Tennessee, the National Park Service, and the Public Roads Administration as follows:

"1.  The program to be arranged on a yearly basis to accomplish the desired results within the next eight or ten years.

"2.  The National Park Service will construct with Federal funds the Foothills Parkway from State Route No. 73 near Kinzel Springs to a connection with State Route No. 71 and the section along State Route No. 71 on both sides of Little Pigeon River from Gatlinburg to a point near Caney Creek.

"3.  For the construction of the Foothills Parkway, the State is required with State Funds to furnish, under the terms of State Senate Bill No. 359 [Pub.Acts 1945, c. 87], a right of way comprising an average of 125 acres per mile of roads.

"4.  The State will acquire the rights of way along State Route No. 71 from Sevierville to Gatlinburg as a Federal-aid project on the basis of one-third Federal funds and two-thirds State and county funds.

"5.  The State and Public Roads Administration will jointly program the acquisition of rights of way and the construction of the roads to complete the loop from the Foothills Parkway on State Route No. 71 to Sevierville and Knoxville and by adding to the Federal Aid System a proposed new road from a point on State Route No. 71 near city limits of Knoxville extending in a southeasterly direction to a point on State Route No. 73 and connecting with the Foothills Parkway between Wal-

land and Kinzel Springs. The State and Public Roads Administration will jointly program the acquisition of rights of way and the construction of a road along present State Route No. 73 from the Foothills Parkway to the Park boundary. Rights of way will be secured by the State on the basis of one-third Federal funds and two-thirds State and county funds. Construction will be on the basis of 50% Federal funds and 50% State funds.

"Rights of way will be secured to provide a width satisfactory for ultimate four lane construction. Design details will be agreed on between the State and Public Roads.

"6. To meet the present traffic needs the first priority of projects is the acquisition of rights of way along State Route No. 71 from Sevierville to Gatlinburg—to be secured by the State on the basis of one-third Federal funds and two-thirds State and county funds—and the construction of a two lane paved road from Sevierville to Caney Branch on the basis of 50% Federal funds and 50% State funds; that portion from Caney Branch along both sides of Little Pigeon River to be built by the National Park Service as a connecting Link to the Foothills Parkway, and also as a part of the first priority is the link from the end of the present concrete paving on State Route No. 71 to the Park boundary.

"7. The programming of Federal-aid projects on the loop each year would be selected as a priority based on traffic needs as jointly determined by the State and Public Roads Administration and planned to accomplish the ultimate desirable improvement within a period of from eight to ten years.

1. Ralph Rogers & Company, Inc., Knox County Sand Company, Mitchell Crushed Stone Co., Inc., C. A. Broecker, Wayne K. Sowers, Gus Sieboldt, W. C. Blakely,

"In Witness Whereof the parties have executed this cooperative agreement as of the 1st day of April, 1948."